**A.W. CHESTERTON COMPANY, INC., et al., Plaintiffs,**

v.

**Arthur W. CHESTERTON, Defendant.**

Civ. A. No. 95–11800–JLT.

United States District Court, D. Massachusetts.

Oct. 27, 1995.

Harry L. Manion, III, Cooley, Manion, Moore & Jones, P.C., Boston, MA, for A.W. Chesterton Company, James D. Chesterton, Thomas Chesterton, Jr., Andrew W. Chesterton, Glenn E. Chesterton, Florence Chesterton, Boston Safe Deposit, Inc.

John E. Bradley, Mahoney, Hawkes & Goldings, Boston, MA, Lawrence P. Heffernan, Michael D. Lurie, Robinson & Cole, Boston, MA, Michael A. Baviello, Jr., Naples, FL, John E. Bradley, Boston, MA, for Arthur W. Chesterton.

## MEMORANDUM

TAURO, Chief Judge.

Plaintiffs, alleging breach of fiduciary duty, seek to enjoin defendant Arthur Chesterton ("Chesterton") from transferring part of his stock holdings in A.W. Chesterton Company, Inc. (the "Company").[1] The parties have agreed that no transfer would take place until this court rendered its decision with respect to the proposed injunction. The court heard argument on the motion for preliminary relief on October 17, 1995.

## I.

## BACKGROUND

The Company is a closely held Massachusetts corporation, which manufactures and distributes fluid sealing devices and related products. From its inception in 1885, the Company has been owned and operated by members of the Chesterton family. The stock of the Company is currently owned by descendants and surviving spouses of two brothers, Thomas Chesterton and Arthur Devereaux Chesterton. The Thomas Chesterton branch of the family (the "TC shareholders") own 51% of the Company's stock.

Plaintiffs in this action are the Company, the TC shareholders, and the daughter of Arthur Devereaux Chesterton, Adele Forman, who owns 12.89% of the Company's stock. The defendant, who owns 27.06% of the stock, is the son of Arthur Devereaux Chesterton.

Since 1988, Chesterton and the TC shareholders have engaged in a struggle over the control and direction of the Company. This law suit presents the latest chapter in that struggle.

In a letter dated June 23, 1995, Chesterton's counsel wrote to the Company, informing it that Chesterton intended to transfer 2,000 shares of non-voting and 2,000 shares of voting stock to A.W.C. Corporation ("AWC"), a Florida corporation, and 250 shares of voting and 250 shares of non-voting stock to World Class, Inc. ("World Class"), a Caymen Island corporation.[2] As of the date of the June 23 letter, Chesterton owned one hundred percent of AWC and World Class.[3] Additionally, neither corporation conducted business nor had any assets or liabilities.

Chesterton's proposed transfer is subject to the Company's rights under a first refusal provision contained in the Company's Restated Articles of Organization. The first refusal provision provides that the Company "shall have the right to purchase or to direct the transfer of, the shares of its capital stock in the event" that the owner attempts to transfer his shares to anyone other than a lineal descendent of the brothers, Thomas and Arthur. The owner must give notice to the Company of his intention to transfer, after which the Company has thirty days to make its election. If the Company elects to purchase the shares or to designate a purchaser, the price is determined by agreement of the parties or, if that fails, by binding arbitration.

---

1. This case was filed in the Massachusetts Superior Court on July 7, 1995 and removed here on August 15, 1995.

2. The evidence does not disclose the precise percentage of Chesterton's holdings in the Company involved in the transfer, but the parties do not dispute that the transfer represents a small percentage of Chesterton's total shares in the Company.

3. In his affidavit, Chesterton states that subsequent to his sending the letter he has conveyed 50% of World Class to an unidentified investor and 5% of AWC to an unidentified investor.

Plaintiffs contend that Chesterton's proposed transfer is a sham, whose sole purpose is to force them to purchase the shares he proposes to transfer to AWC and World Class. The alleged bite to Chesterton's scheme is that in 1985 the Company opted to become an S-corporation for federal tax purposes. As the June 23 letter acknowledges, the transfer of Company stock to a corporation would nullify the Company's S-corporation status. Plaintiffs, therefore, have the choice of losing the tax benefits of S-corporation status or arranging for the purchase of Chesterton's shares.[4]

The federal tax code treats an S-corporation like a partnership. The income of an S-corporation is considered to be income of the shareholders, who are taxed on a pro rata basis for the corporation's income. In contrast to a C-corporation, which is subject to "double taxation" in the form of federal corporate income tax and personal income tax on shareholder dividends, the income generated by an S-corporation is taxed only once. When a corporation forfeits its S-corporation status, it cannot reelect to become an S-corporation any earlier than 5 years after its ineligibility date.

The Company's status as an S-corporation has a unique characteristic. Because the Company opted to become an S-corporation prior to 1986, it is not subject to § 1374 of the Internal Revenue Code. The purpose of § 1374 is to limit the gain that a C-corporation can realize from a sale of assets by electing S-corporation status. Section 1374 achieves this by imposing a tax on any gain to an S-corporation from the sale of assets if those assets were acquired prior to the S-corporation election and if the sale occurs within ten years of the election. If the Company loses its S-corporation status, a subsequent reelection of S-corporation status will not be favored with grandfathered status.

The evidence supports an inference that Chesterton's ultimate aim in proposing the transfer is to force the Company to purchase his shares. Chesterton freely acknowledges that he desires to divest himself of his holdings in the Company. He has unsuccessfully attempted to find a buyer for his shares. And has been unable to get the other shareholders to agree to a sale of all of the assets of the Company.

Significantly, statements in the June 23 letter concede that Chesterton ignored the interests of the corporation and looked only to his self-interest when he announced his intention to transfer stock to AWC and World Class. In the June 23 letter, Chesterton's counsel writes that the transfer is intended to increase the liquidity of his holdings in the Company. In his affidavit, Chesterton also states that the transfer serves his interests because it will shield him from the tax liabilities caused by the Company's S-corporation status.

Notwithstanding these assertions by and on behalf of Chesterton, the court infers that Chesterton's prime motive for putting this small fraction of his holding in play is to establish either a per share sale offer or an arbitration value, which would govern the disposition of his other shares.

From the examination of the evidence presented, the court finds that Plaintiffs are likely to show that Chesterton has engaged in a scheme to coerce the Company to repurchase his shares, that his purpose is to pursue his own financial interests, and that his plan jeopardizes the Company's ability to operate as an S-corporation. The issue, then, is whether these findings are sufficient to merit granting Plaintiffs' request for preliminary injunctive relief.

## II.

## DISCUSSION

### A. The Standard for a Preliminary Injunction

■ In deciding whether to grant a request for preliminary injunctive relief, a district court must weigh four factors: (1) whether the movant will suffer irreparable injury if the preliminary injunction is not granted; (2) whether the balance of the equities favors issuance of the preliminary injunc-

---

**4.** Chesterton suggests in his affidavit that the value of the Company is $161 million. By that estimate, it would cost approximately $40 million to buy his total holdings.

tion; (3) whether the movant is likely to prevail on the merits; and (4) whether the public interest will not be adversely affected by granting the injunction. *Gately v. Commonwealth of Mass.*, 2 F.3d 1221, 1224–25 (1st Cir.1993); *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981).

In this case, it is evident that the public interest is not adversely affected by granting injunctive relief. Accordingly, the focus of the court's inquiry is on the first three factors.

## B. *Likelihood of Success on the Merits*

■ Although the *sine qua non* of the preliminary injunction standard is whether the movant is likely to succeed, *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir.1993), the movant need not demonstrate that there is no chance that he will lose. Rather, the court's analysis regarding the merits can only be "understood as statements of probable outcomes." *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir.1991). The movant's burden regarding the showing of a probability of success varies depending on the corresponding harm to the opposing party of issuing the injunction. *A–Copy, Inc. v. Michaelson*, 599 F.2d 450, 451 (1st Cir.1978).

■ Under Massachusetts law, a shareholder in a closed corporation owes the corporation and its shareholders a duty of utmost good faith and loyalty.[5] *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 593, 328 N.E.2d 505, 515 (1975); *Blank v. Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 408, 649 N.E.2d 1102, 1105 (1995). Minority, as well as majority shareholders owe such a duty. *Smith v. Atlantic Properties, Inc.*, 12 Mass.App.Ct. 201, 208 n. 9, 422 N.E.2d 798, 802 n. 9 (1981). The burden is on the defendant to show that his challenged conduct serves a legitimate purpose. *Zimmerman v. Bogoff*, 402 Mass. 650, 658, 524 N.E.2d 849, 854 (1988).

In *Smith*, the corporate by-laws provided that decisions concerning operation of the corporation must command 80% of the shareholders vote. 12 Mass.App.Ct. at 202, 422 N.E.2d at 799. The defendant shareholder in *Smith* had a 25% holding and, thus, effectively had veto power over corporate decisions. *Id.* Pursuing his personal income tax interests, the defendant in *Smith* used his veto power to prevent the distribution of dividends over several years. As a consequence, the corporation suffered a number of tax penalties. The court held that such conduct violated the defendant's duty of utmost good faith and loyalty to the corporation. *Id.* at 209, 422 N.E.2d at 803.

■ Chesterton's effort to transfer his stock bears a marked resemblance to the defendant's conduct in *Smith*. In sole pursuit of his financial interests, Chesterton threatens the Company's favorable tax status. This behavior falls squarely within the Supreme Judicial Court's admonition that a minority shareholder in a close corporation may not damage the corporation "through unscrupulous and improper 'sharp dealings' with an unsuspecting majority." *Donahue*, 367 Mass. at 593 n. 17, 328 N.E.2d at 515 n. 17.

In other contexts, Massachusetts courts have recognized that use of sharp practices to coerce a person to do what he is not otherwise legally required to do is improper. *See, e.g., Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 475, 583 N.E.2d 806, 822 (1991) (knowing use of a pretext to coerce person into paying more than was owed under a contract is an unfair act within the meaning of Mass.Gen.Laws c. 93A and is a breach of the implied covenant of good faith and fair dealing). *See also Pepsi–Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 17–19 (1st Cir.1985) (unfair act to withhold payment due under a contract as a wedge for enhancing bargaining power). Here, because the governing documents of the Company do not contain a shareholder redemption provision, the Company is not generally obligated to redeem Chesterton's

---

5. Plaintiffs' complaint also asserts contract related counts. Plaintiffs, however, conceded at the hearing on this motion that the only basis for injunctive relief is their breach of fiduciary duty claim. Accordingly, the court will limit consideration to their likelihood of success on that claim.

shares. In seeking to impose a redemption right without regard to the Company's interests, Chesterton disregards his duty to act in utmost good faith.

Chesterton contends that the fiduciary duty of a minority shareholder is limited to actions undertaken in a managerial capacity. In support of this proposition, Chesterton points to the fact that the defendant in *Smith* was acting in the course of management of the corporation. Nonetheless, the focus of *Smith* is not on the capacity in which the defendant acted, but on the manner and effect of his actions. To the extent that Chesterton's conduct is fairly described as extorting the redemption of his shares through the threat of the loss of S-corporate status, his conduct may be considered to affect the operation of the Company, and, therefore, within the reach of *Smith*.

Chesterton further contends that he has not breached his fiduciary duty, because his conduct relates to the transfer of stock and adheres to the letter of the corporate documents. In support of this position, Chesterton relies on *Evangelista v. Holland*, 27 Mass.App.Ct. 244, 537 N.E.2d 589 (1989). In that case, four brothers holding equal shares in a closed corporation entered into an agreement requiring the corporation to buy-out for $75,000 the estate for any shareholder who died. *Id.* at 590–91. Subsequent to that agreement, one of the brothers transferred his stock to his two children with an eye toward their participation in the management of the corporation. *Id.* at 245–46, 590–91. The other brothers balked at this participation. They agreed to buy-out the two children for $191,000, but the deal was never consummated. Upon the death of one of the brothers, his estate sought to hold the corporation to the $191,000 price. In finding that the corporation was not required to offer the higher price, the court wrote that "questions of good faith and loyalty do not arise when all the stockholders in advance enter into an agreement for the purchase of stock of a withdrawing or deceased stockholder." *Id.* at 249, 537 N.E.2d at 592.

Chesterton overstates the import of *Evangelista* in suggesting that it resolves the issue in this case. First, contrary to Chesterton's suggestion, a minority shareholder can breach his duty when he acts within letter of the corporate documents. For example, the defendant in *Smith* acted within the scope of the corporate documents. 12 Mass.App.Ct. at 205, 422 N.E.2d at 799. Second, the fact that the challenged conduct relates to the transfer of shares does not mean that a shareholder's fiduciary duty cannot arise. *See Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 852, 353 N.E.2d 657, 664 (1976) ("design to pressure [minority shareholder] into selling his shares to the corporation at a price below their value" violates shareholder duty) The present case is merely the flip side of *Wilkes*. In *Wilkes*, the majority shareholders used sharp practice to procure the stock of a minority shareholder, whereas here the minority shareholder attempts to use a sharp practice to force the repurchase of his shares.

The language of *Evangelista* quoted above is better understood as articulating the scope of shareholder duties where the shareholder acts both within the boundaries of prior corporate agreements, and without using the terms of those agreements in a manipulative manner. And so, while Plaintiffs could not complain about the price determination mechanism contained in the first refusal provision, they can complain about the collateral coercive conduct by Chesterton in attempting to force them to repurchase his shares. *See King v. Driscoll*, 418 Mass. 576, 586, 638 N.E.2d 488, 494 (1994) (improper conduct causing the repurchase of shareholder's stock constituted breach of fiduciary duty). Accordingly, the court concludes that there is a significant likelihood that Plaintiffs will succeed on the merits of their breach of fiduciary duty claim.

## C. *Irreparable Injury*

Plaintiffs contend that the harm caused by the loss of S-corporation status is irreparable because the resulting damages cannot be calculated, and because the Company's grandfathered status cannot be restored once lost. Injunctive relief is appropriate when damages are difficult to measure. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 865–66,

96 L.Ed. 1153 (1952). Where there is a significant difficulty in assessing damages, preliminary injunctive relief is necessary "to assure the presence of an adequate legal remedy." *Unisys Corp. v. Dataware Prods., Inc.*, 848 F.2d 311, 314 (1st Cir.1988); *see also Puerto Rico Conservation Found. v. Larson*, 797 F.Supp. 1066, 1070 (D.P.R.1992) ("Although the need to prevent irreparable injury to a party is an important factor when considering a petition for preliminary injunction, the most compelling reason to grant this request is the 'need to prevent the judicial process form being rendered futile by defendant's action or refusal to act.' ") (quoting 11 Wright & Miller, *Federal Practice and Procedure* § 2947, at 146 (Supp.1991)).

In this case, Plaintiffs' damages from losing the Company's S-corporation status will be difficult to calculate because the amount of loss depends on the uncertainty of the Company's future income.[6] Further, the damages from losing the grandfathered status are similarly difficult to measure. Finally, in *San Francisco Real Estate Investors v. Real Estate Inv. Trust of America*, 701 F.2d 1000, 1007 (1st Cir.1983), the First Circuit recognized that loss of a tax-advantaged status constituted irreparable harm. Accordingly, the court concludes that loss of the Company's S-corporation status satisfies the irreparable injury requirement.

Chesterton observes that Plaintiffs can avoid losing its S-corporation status by exercising its right to purchase Chesterton's tendered shares. Because the Company possesses means to avoid the injury, Chesterton contends that the harm is not irreparable. The court disagrees.

By requiring Plaintiffs to purchase Chesterton's shares to avoid the threatened injury, the court would be in effect aiding Chesterton in the object of his purported scheme. Equity does not require a plaintiff to acquiesce in the violation of his rights in order to avoid a claim that the injury is self-inflicted. *See Stewart B. McKinney Found., Inc. v. Town Plan and Zoning Comm'n*, 790 F.Supp. 1197, 1209 (D.Conn.1992) (injury not avoidable where self-help remedy requires plaintiff to acquiesce in the violation of his rights). Because the very wrong alleged by Plaintiffs in this case is that Chesterton is breaching his fiduciary duty by putting the Company to the untenable choice of purchasing his shares or losing its S-corporation status, Plaintiffs exercise of self-help would come at the cost of acceding to Chesterton's plan.

Moreover, it is far from clear that Plaintiffs' injury from the forced repurchase of Chesterton's shares is not itself irreparable. As Plaintiffs observed during oral argument, the Company is undergoing a period of intensive capital investment. The effect on future profits from diverting resources to the repurchase of Chesterton's shares will be extraordinarily difficult to estimate. Further, the Company will incur the costs of renegotiating its credit agreement with the Bank of Boston,[7] as well as whatever additional financing costs a prospective financial institution would attach to the fact that the Company will be redeeming the stock of its shareholders. Finally, these potential costs are exacerbated by the Damoclean sword Chesterton holds over the Company, i.e., the specter of him transferring his entire holdings to AWC and World Class.

For all these reasons, the court concludes that if it refused to grant preliminary relief, and thereby forced Plaintiffs to purchase Chesterton's shares, it would be unable to provide an adequate remedy to Plaintiffs. 11A Wright, Miller, & Kane, *Federal Practice and Procedure* § 2948.1, at 144–149 (preliminary relief appropriate when necessary to

---

6. Chesterton contends that it is not clear that the Company and its shareholders actually benefit from S-corporation status. The focus of the court's inquiry, however, is on whether the Company will lose a tax status it reasonably believes is beneficial, not whether the Company's assessment of those tax benefits is accurate. If it were otherwise, the court would have to engage in detailed analyses of the Company's management and dividend decisions. In any case, Chester-

ton's analysis of the consequence of S-corporation status simply reinforces the court's conclusion regarding the difficulty of calculating damages in this case.

7. The Company currently has a credit agreement with the Bank of Boston that prohibits it from redeeming stock.

preserve courts ability to provide an adequate remedy to the plaintiff).

As the court found above, while Chesterton has tendered only a small percentage of his shares, it appears that if he receives a favorable price he will tender his remaining holdings. The prospect of further transfers weighs in favor of issuing preliminary relief. The difficulty of calculating the effect of repurchase on the Company's earnings is heightened if it involves all of Chesterton's stock. Moreover, the issuance of preliminary relief circumvents the threat of multiple suits stemming from future efforts by Chesterton to transfer shares to AWC and World Class. *See generally* 11A Wright, Miller, & Kane, *supra,* § 2944, at 89 (legal remedy may be deemed inadequate where effective relief can be secured only by a multiplicity of actions).

Assuming *arguendo* that the court should consider the self-help available to Plaintiffs, it does not necessarily follow that the availability of self-help negates the irreparability of the loss of the Company's S-corporation status. If Chesterton's contention to the contrary were accepted, preliminary relief would almost never be available. Every moving party has *some* means, however impractical, for avoiding injury. The mere fact that Plaintiffs are not wholly powerless to avoid a threatened injury, therefore, does not resolve whether such injury is irreparable. Rather, the court must consider the hardship

imposed on the plaintiff by taking action to avoid the injury, as opposed to the role the plaintiff played in creating the conditions giving rise to the need for such action.[8] The court concludes that the balancing of these factors do not favor imposing on Plaintiffs the burden of purchasing Chesterton's shares.

### D. Balancing the Equities

■ In balancing the equities, the court must examine the hardship to the nonmovant if the preliminary relief is granted against the hardship to the movant if the interim relief is withheld. *Narragansett Indian Tribe,* 934 F.2d at 6. Here, the only injury that Chesterton asserts will be caused by delaying the stock transfer is the possibility of "catastrophic tax liability" should the Company decline to pay sufficient dividends. Chesterton offers no evidence to suggest that this event will ever occur. This omission is not surprising given that the majority shareholders would face precisely the same tax problems if the Company failed to pay adequate dividends. In contrast to this speculative injury, Plaintiffs face the immediate threat of either losing the S-corporation status or altering the financial plans of the Company by purchasing Chesterton's stock. Accordingly, the court concludes that the balance of equities favor issuing preliminary relief.[9]

---

**8.** *See, e.g., FIBA Leasing Co., Inc. v. Airdyne Indus., Inc.,* 826 F.Supp. 38, 39 (D.Mass.1993) ("[a] preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted"). In *FIBA Leasing,* FIBA had leased trailer equipment to Airdyne. Airdyne failed to make payments under the lease and resisted FIBA's repossession efforts. FIBA canceled the vehicle registrations for the trailer equipment. In seeking a preliminary injunction, FIBA contended that it would be liable if Airdyne injured a third party by operating unregistered equipment. The court held that such liability was not irreparable injury because the unregistered status of the trailer was under the control of FIBA. In other words, the affirmative action that FIBA needed to perform in order to avoid irreparable injury was merely to undo its prior act.

**9.** Plaintiffs originally filed this motion in state court prior the removal of this action. In their memorandum in support of their motion for preliminary injunctive relief, Plaintiffs' recitation of

the standard for preliminary injunctive relief relied on Massachusetts law. Massachusetts follows the balancing approach advanced by Professor Leubsdorf. *Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 616–17, 405 N.E.2d 106, 111–12 (1980) (citing John Leubsdorf, *The Standard for Preliminary Injunctions,* 91 Harv.L.Rev. 525 (1978)). Under this approach, an injunction may issue when "the risk of irreparable harm to a plaintiff, in light of his chances of success on his claim, outweigh the defendant's probable harm and likelihood of prevailing on the merits of the case." *Commonwealth of Mass. v. Mass. CRINC,* 392 Mass. 79, 87, 466 N.E.2d 792, 797 (1984). In cases such as the one presently before the court, the Leubsdorf standard is arguably more lenient than the federal standard. Because the court concludes that issuance of preliminary injunctive relief is appropriate under the federal standard, the decision in this case would be the same if it applied the Massachusetts standard. Thus, the court need not decide whether state or federal law controls the standard for issuance of

## III.

## CONCLUSION

In sum, granting preliminary relief to Plaintiffs will merely preserve the status quo, thereby permitting the court to conduct an expedited resolution of the merits, and, should Plaintiffs prevail, to remedy their injury. Accordingly, Plaintiffs' motion for preliminary injunctive relief is hereby ALLOWED.

a preliminary injunction. *Cf. Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98, 101–02 (6th Cir.1991) (federal law governs preliminary injunction standard); *Ferrero v. Associated Materials Inc.,* 923 F.2d 1441, 1448 (11th Cir.1991) (same); *Equifax Services, Inc. v. Hitz,* 905 F.2d 1355, 1361 (10th Cir.1990) (same). *See also Campbell Soup Co. v. Giles,* 47 F.3d 467, 469 (1st Cir.1995) (applying federal standard in diversity case).