**A.W. CHESTERTON COMPANY, INC., et al., Plaintiffs,**

v.

**Arthur W. CHESTERTON, Defendant.**

CA No. 95–11800–JLT.

United States District Court,
D. Massachusetts.

Jan. 15, 1997.

Paul F. Beckwith, Harry L. Manion, III, John T. Hugo, Cooley, Manion, Moore & Jones, P.C., Boston, MA, for A.W. Chesterton Company, James D. Chesterton, Thomas Chesterton, Jr., Andrew W. Chesterton, Glenn E. Chesterton, Florence Chesterton, Boston Safe Deposit, Inc.

Lawrence P. Heffernan, Michael D. Lurie, Robinson & Cole, Boston, MA, Michael A. Baviello, Jr., Naples, FL, John E. Bradley, Tillinghast Licht & Semonoff, Boston, MA, for Arthur W. Chesterton.

Harry L. Manion, III, Cooley, Manion, Moore & Jones, P.C., Boston, MA, for A.W. Chesterton Company, James D. Chesterton, Thomas Chesterton, Jr., Andrew W. Chesterton, Glenn E. Chesterton, Florence Chesterton, Boston Safe Deposit, Inc.

### MEMORANDUM

TAURO, Chief Judge.

Plaintiffs are A.W. Chesterton Company ("the Company") and members of the Chesterton family who control a majority of the Company's shares. Defendant is Arthur Chesterton, a minority shareholder of the Company. Plaintiffs bring this action to enjoin Defendant from selling a portion of his shares to other corporations, because such transactions would have the effect of terminating the Company's favorable tax status as a subchapter S-corporation. Presently before the court, following a bench trial, are Plaintiffs' claim for breach of fiduciary duty and request for permanent injunctive relief.

## I.

### Background

The Company is a closely-held Massachusetts corporation. It was founded one century ago by Arthur Wellington Chesterton, and is currently owned and operated by his descendants. The Company manufactures mechanical seals for heavy industrial products. It conducts business in ninety countries, employs 1,300 workers, and expects to earn $170 million in sales this year.

### The Company's S Election

In 1985, the Board of Directors voted to change the Company's status under the Internal Revenue Code from a C-corporation to an S-corporation. The Board sought to make this change because it would generate considerable tax savings.[1]

To finalize the S election, the Board was required to obtain the unanimous consent of the shareholders. *See* 26 U.S.C. § 1362(a)(2). Officers of the Company, therefore, undertook to educate the shareholders about S-corporations. In so doing, they not only informed the shareholders of the substantial benefits of S status, they also explained its limitations.[2] In particular, they explained that the Company's S status would be automatically terminated if a shareholder sold shares to another corporation. Every shareholder, therefore, was thoroughly briefed with respect to the limitations of S status.

Having been fully informed about S-corporations, the shareholders unanimously approved the Company's S election and signed consent forms. In addition, they demonstrated a general agreement they would do nothing that would adversely effect the Company's S status. This included, among the other aforementioned restrictions, the fact they could not transfer their shares to a corporation.

Defendant not only supported the S election, he also played a key role in the process. At the time of the election, he was an officer and director of the company. He understood the intricacies of S-corporations and explained them to the other shareholders. In addition, he saw that every shareholder executed a signed consent form. He signed and filed the federal tax forms required for the S election.

Between 1985 and 1995, the shareholders received an additional $5.3 million in dividends as a result of the S election. Defendant, alone, received an additional $1.4 million.

### Defendant's Proposed Transfer

Defendant proposes to transfer a portion of his shares in the Company to two shell corporations that are wholly owned by him, A.W.C. Corporation ("AWC") and World Class, Inc. ("World Class").[3] The Company's Restated Articles of Organization (the "Articles") grant the shareholders the right to transfer their shares. The Articles require, however, that a selling shareholder give the Company thirty-days notice if the shareholder is selling shares to a party outside of the Chesterton family. The Company then has the right to avoid the sale by purchasing the shares itself prior to the expiration of the thirty-day period. The Articles, themselves, impose no other express restrictions on the right to transfer.

In a June 13, 1995 letter to James D. Chesterton, the President and Chief Executive Officer of the Company, Defendant gave

---

**1.** The income of C-corporations is taxed twice—to the corporation and, then, to shareholders when they receive dividends. The income of S-corporations, however, is only taxed once—to shareholders. The corporation, itself, is never taxed. A greater percentage of income is, therefore, available to an S-corporation and its shareholders. *See* 26 U.S.C. §§ 1361–1399.

**2.** S-corporations are limited in four primary ways: they cannot have more than thirty-five shareholders, have entities as shareholders, have nonresident aliens as shareholders, or have more

than one class of stock. 26 U.S.C. § 1361(a)–(b). If an S-corporation violates one of these limits, it automatically loses its S status. 26 U.S.C. § 1362(d)(2).

**3.** AWC and World conduct no business and have no significant assets. World Class is a Cayman Island corporation whose principal place of business is a post office box. AWC is a Florida corporation whose principal place of business is an attorney's office. Defendant is the sole shareholder of both corporations. He is also the sole officer and director of AWC.

proper notice of his proposed transfer. The Company subsequently considered whether to purchase Defendant's shares, but decided that it could not afford to do so.

Defendant seeks to consummate the proposed transaction in order to liquidate his holdings in the Company. He claims that, by turning over his Company shares to AWC and World Class, these companies will become attractive to investors.[4]

Defendant claims that this scheme is necessary because he has been unable to sell his shares in the Company directly. Apparently, prospective buyers have not been interested in purchasing only a minority interest in the Company.

### *The Effect of the Proposed Transfer*

The proposed transfer would automatically terminate the Company's S status, because the Company's shareholders would consist of corporations as well as persons. 26 U.S.C. § 1362(d)(2). The Company would not be able to regain its S status for a minimum period of five years. 26 U.S.C. 1362(g). It would never be able to regain the broad scope of its current S status.[5]

Plaintiffs, in theory, could avoid this result. As has been pointed out, the Articles provide the Company with a right of first of refusal as to Defendant's shares. This option, however, would cost millions of dollars. The Company has insufficient funds to purchase the shares and, because of its current credit arrangement, cannot borrow that amount of money without embarking on a disadvantageous refinancing agreement.

### *Procedural Background*

This case is properly before the court pursuant to 28 U.S.C. § 1332. Plaintiffs commenced the action in Middlesex County Superior Court on July 7, 1995, alleging (1) breach of fiduciary duty, (2) breach of contract, (3) breach of implied covenant of good

faith and fair dealing, and (4) interference with advantageous relationship. Defendant removed the case to this court on August 11, 1995 and subsequently filed a counterclaim in which he asserts his Dissenter's Rights, under M.G.L. ch. 156B ("ch. 156B") and seeks the fair value of his shares.

On October 27, 1995, the court granted Plaintiffs' motion for a preliminary injunction. *A.W. Chesterton Co., Inc. v. Chesterton,* 907 F.Supp. 19 (D.Mass.1995).

Prior to trial, the parties stipulated to the dismissal of counts (2)-(4) of Plaintiffs' complaint. The court held a bench trial on October 7-9, 1996 as to the Plaintiff's sole remaining claim and Defendant's counterclaim. The parties submitted final post-trial briefs on December 16, 1996.

### II.

### *Analysis*

Plaintiffs seek to enjoin Defendant from carrying out the proposed sale in order to preserve the Company's S status. They allege that Defendant will breach his fiduciary duty by consummating the sale. In the event that the court grants such relief, Defendant seeks the fair value of his shares, pursuant to ch. 156B.

### A. *Plaintiff's Claim for Permanent Injunctive Relief*

In deciding whether Plaintiffs are entitled to permanent injunctive relief, the court must look to four factors: (1) whether Plaintiffs prevail on the merits, (2) whether Plaintiffs will suffer irreparable injury absent injunctive relief, (3) whether the harm to Plaintiffs outweighs the harm Defendant would suffer from the imposition of an injunction, and (4) whether the public interest will be adversely affected by the injunction. *See Indian Motocycle Assoc. III Ltd. Partnership v. Massa-*

---

**4.** To date, Defendant has attracted only one investor, a friend named George Kraus, who has pledged to purchase approximately $140,000 in shares of AWC and World Class.

**5.** 26 U.S.C. § 1374 limits the benefits accruing to S-corporations, by imposing a corporate-level tax on the sale of S-corporation assets. The Compa-

ny, however, is not subject to this tax, because it enjoys grandfathered status. *See* 28 U.S.C. § 1374(c)(1). The Company will forever lose this grandfathered status if its S status is terminated, even if it successfully regains S status when the five year black-out period expires.

*chusetts Housing Finance Agency*, 66 F.3d 1246, 1249 (1st Cir.1995) (quoting *In re Savage Indus., Inc.*, 43 F.3d 714, 719 n. 8 (1st Cir.1994)).

Clearly, the public interest would not be adversely affected by the imposition of an injunction in this case. The court considers the remaining factors *seriatim*.

### 1. *The Merits of Plaintiffs' Claim*

 Plaintiffs allege that they are entitled to injunctive relief, because Defendant's proposed course of action would breach his fiduciary duty to the Company and its shareholders. In Massachusetts, shareholders in a close corporation owe a duty of utmost good faith and loyalty to the corporation and to other shareholders. *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 593, 328 N.E.2d 505, 515 (1975). This duty is more rigorous than that owed by directors and shareholders of an ordinary corporation. *Id.* at 593–94, 328 N.E.2d at 515–16. It bars shareholders from taking action based on "avarice, expediency, or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." *Id.* at 593, 328 N.E.2d at 515. It does not, however, bar shareholder action which is based on a legitimate business purpose, unless less harmful means to achieve such a purpose are available. *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 850–52, 353 N.E.2d 657, 663 (1976). All shareholders, including minority shareholders, are bound by the duty. *See Smith v. Atlantic Properties, Inc.*, 12 Mass.App.Ct. 201, 208–09, 422 N.E.2d 798, 802–03 (1981). *See also Zimmerman v. Bogoff*, 402 Mass. 650, 657–8, 524 N.E.2d 849, 853–54 (1988).

 Defendant, notwithstanding his fiduciary obligations, seeks to consummate a transaction that would strip the Company of its advantageous status as an S corporation. Plaintiffs argue that Defendant would breach his duty of utmost good faith and loyalty by carrying out this transaction. This court agrees.

First, the sale violates the agreement of the shareholders when they elected S status. At the time of the S election, the shareholders were informed and understood that the Company would lose its S status if a shareholder sold shares to another corporation. By unanimously electing S status, the shareholders agreed that they would not act in any way that would cause the Company to lose the considerable benefits of S status. This agreement was memorialized by the signed consent forms executed by each shareholder, as well as the subsequent yearly tax returns.

In view of the agreement regarding S status, which Defendant supported and facilitated, he cannot now sell his shares in a manner that would terminate the Company's S status, even though he would have been entitled to do so under the Articles had there been no S status agreement. In other words, the S election, unanimously agreed to by the shareholders and the Board of Directors, modified the broader terms of the Articles. Disregarding the S agreement, and its known restrictions and implications, would offend Defendant's fiduciary duty to act towards his fellow shareholders with good faith and loyalty. *See Zimmerman*, 402 Mass. at 659, 524 N.E.2d at 854 (holding that shareholder breached duty of utmost good faith and loyalty when, *inter alia*, reneged on good faith agreement with corporation); *Wilkes*, 370 Mass. at 852–53, 353 N.E.2d at 664 (holding that shareholders breached duty of utmost good faith and loyalty when, *inter alia*, engaged in course of action which was contrary to common understanding of shareholders).

 Second, the sale is not supported by a legitimate business purpose designed to advance Company interests, as required by *Wilkes*. *Wilkes*, 370 Mass. at 851, 353 N.E.2d at 663. Defendant's proposed sale to the shell corporations is exclusively designed to advance his own self-interest. Defendant admits as much. His own attorney wrote that his "action [is] based solely on his own best financial interest." No evidence supporting a legitimate business purpose emerged at trial. Defendant does not even proffer a legitimate business purpose in his post-trial briefs. Clearly, Defendant lacks a legitimate business purpose for the sale. His proposal is a classic portrait of the "avarice, expediency, [and] self interest" which was repudiated by Chief Justice Tauro in *Dona-*

*hue. Donahue,* 367 Mass. at 593, 328 N.E.2d at 515.

Indeed, the sale is wholly antagonistic to the best interests of the Company. The Company and its shareholders have enjoyed substantial benefits from the Company's status as an S corporation, having received an additional $5.3 million in dividends. Expert testimony presented at trial establishes that such benefits will likely continue unless the Company's S status is terminated. The sale would revoke these benefits and would, therefore, have a detrimental effect on the Company and its shareholders.

The court's holding here is supported by *Smith v. Atlantic Properties, Inc.,* 12 Mass. App.Ct. 201, 422 N.E.2d 798 (1981). In *Smith,* the defendant, a minority shareholder in a close corporation, vetoed a dividend distribution, in part because he sought to reinvest the earnings back into the corporation. *Id.* As a result of the defendant's veto, the corporation incurred a tax penalty. *Id.* Even though the corporation's articles of organization granted the defendant veto-power, the court held that the defendant breached his fiduciary duty because "he recklessly ran serious and unjustified risks" of incurring the tax penalty. *Id.* at 209, 422 N.E.2d at 803.

Here, as in *Smith,* Defendant is a minority shareholder who seeks to pursue a course of action which would have been authorized by the Articles had there been no S agreement, memorialized by the signed consent forms. But the proposed course of conduct here, as in *Smith,* would violate the duty of utmost good faith and loyalty, because it recklessly and unjustifiably exposes the Company to greater tax liability.

This case is even more egregious than *Smith,* in that Defendant's proposed actions are exclusively grounded in self-interest, whereas in *Smith,* the defendant had a business purpose for his actions.

### Defendant's Argument

Defendant virtually admits that, under current law, he is in breach of his fiduciary duty. Defendant, however, argues for an expansion of the law. He asserts that minority shareholders, such as Defendant, who hold no management positions and, therefore, have no involvement in or control over corporate affairs, need not demonstrate a legitimate business purpose for their actions. According to Defendant, shareholders who hold no management position and exert no influence are, by definition, powerless to pursue legitimate business purposes. Defendant, therefore, asserts that such shareholders need only show a "bona fide" purpose for their actions. Under this proposed test, a shareholder may pursue non-corporate, personal business goals so long as they are not designed to harm the corporation or its shareholders. Defendant alleges that the Company's poor management and diminished earnings give him a "bona fide" purpose to pursue the proposed sale.

Assuming *arguendo* that Defendant's "bona fide" purpose test is valid, Defendant's proposed sale would still violate his fiduciary duty. First, the "bona fide" purpose test, by its own terms, does not apply to Defendant. According to Defendant, the test applies to minority shareholders who hold no management position and have no control over the corporation. Here, Defendant no longer holds a management position, but did at the time of the S election. His proposed action threatens to terminate the Company's S status, thereby unilaterally vetoing a corporate policy adopted by, and still supported by, all other shareholders. Defendant's proposed "bona fide" purpose argument has no merit.

Second, Defendant does not have a "bona fide" purpose for the proposed sale. He claims that he could not find a buyer for his minority interest in the Company. He, therefore, seeks to liquidate his interest in the Company indirectly, by transferring shares to AWC and World Class and, then, selling shares of these shell corporations. There is no credible basis for his scheme. The primary asset of the shell corporations would be Defendant's Company stock, for which the evidence shows there is no market. Defendant, himself, could not explain how this transfer would, somehow, make his shell corporations more marketable. The court, therefore, finds that Defendant lacked a valid

purpose for the proposed transfer.[6]

Third, Defendant could have achieved his goal of liquidating his interest through less harmful means. Even if a shareholder's conduct is supported by a valid purpose, such conduct breaches the duty of utmost good faith and loyalty when less harmful alternatives are available. *Wilkes,* 370 Mass. at 850–2, 353 N.E.2d at 663. Here, Defendant could have achieved his goal of liquidating his interest in the Company by either borrowing funds based on the value of his shares or by selling his shares directly to George Kraus, who has supposedly signified his willingness to invest in such shares by agreeing to invest in AWC and World Class. These alternatives would not only spare the Company's S status, they would also be more effective methods of liquidating Defendant's shares.

## 2. *Irreparable Injury*

■ As discussed above, the proposed transaction would result in the automatic termination of the Company's S status. The Company would not be able to regain S status for a minimum of five years. *See* 26 U.S.C. § 1362(g). The Company would never be able to regain the broad scope of its current S status. *See supra* n. 2.

This constitutes irreparable harm. "If the plaintiff suffers a substantial injury that is not accurately measurable ... irreparable harm is a natural sequel." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 18 (1st Cir.1996). Plaintiffs would undoubtedly suffer substantial injury from termination of the Company's S status. They have received an additional $5.3 million in dividends as a result of the S election and these benefits are likely to continue if the Company retains its S status. The degree of

this injury, however, is immeasurable, because the amount of the increased tax liability would be contingent on the Company's future earnings and distributions. In view of the substantial and uncertain nature of the harm that Plaintiffs' would suffer, injunctive relief is appropriate.

Defendant argues that irreparable harm will not ensue because, between 1991 and 1995, Plaintiffs could have distributed dividends differently, through an affiliate, in which case the Company's own tax status would have been immaterial.[7] The court, however, is not convinced that this method of distribution would be appropriate or that it would provide significant advantage in future years. The court, therefore, rejects Defendant's argument and finds that Plaintiffs will suffer irreparable injury if the sale if consummated.

## 3. *Balancing the Equities*

■ Finally, the court must balance the harm Plaintiffs will suffer if the sale is consummated against the harm Defendant will suffer if the sale is enjoined.

Enjoining the sale would not harm Defendant, because the sale is ill-conceived and would not advance his interests. If Defendant was unable to find a buyer for his shares in the Company, it strains logic to believe that he would be able to find a buyer for shares in AWC and World Class when their primary assets are the very same shares he was previously unable to sell. Moreover, Defendant has more effective alternatives available to achieve his goal of liquidating his interest in the Company which the injunction would not bar.

---

**6.** To establish the legitimacy of his scheme, Defendant raises the fact that he has already attracted one investor, George Kraus. The court, however, does not find this evidence persuasive. Kraus is a friend of Defendant and has pledged to invest in AWC and World Class as a personal favor. Kraus' investment, therefore, is aberrational. In support of this finding, the court notes that Defendant obtained Kraus' commitment only after the complaint in this action was filed. Significantly, Kraus' investment would merely liquidate approximately 10% of the shares Defendant seeks to transfer.

**7.** At the preliminary injunction stage of this litigation, Defendant raised an additional argument, that Plaintiffs would not suffer irreparable harm because they could avoid the consequences of Defendant's proposed sale by exercising the Company's right of first refusal. Now, Defendant expressly abandons this argument, so the court does not address it. Notably, however, the court rejected this argument at the preliminary injunction stage. *Chesterton,* 907 F.Supp. at 24.

Plaintiffs, on the other hand, would suffer considerable harm from the consummation of the sale. As indicated above, the sale would result in automatic termination of the Company's S status and would subject Plaintiffs to greater tax liability.

In view of these considerations, and the others discussed above, the court finds that Plaintiffs are entitled to a permanent injunction barring Defendant from transferring a portion of his shares to AWC and World Class.

### B. *Defendant's Counterclaim*

Defendant argues that, if the court enjoins the proposed sale, he is entitled to relief under ch. 156B. Chapter 156B requires corporations, in limited situations, to buy back the shares of shareholders who object to corporate actions. This obligation arises, *inter alia*, when a corporation adopts an amendment to its articles of organization which restricts the transferability of the corporation's shares. M.G.L. ch. 156B, §§ 76–77. In anticipation of the court's holding as to Plaintiffs' claim, Defendant argues that the Company's S election implicitly amended the articles and, thereby, triggered ch. 156B.

■ Even if the Company's S election is deemed to have triggered shareholder appraisal rights under ch. 156B,[8] Defendant is not entitled to relief because he does not meet the statute's requirements. A shareholder is only entitled to payment for his shares if, prior to the vote in which a transfer restriction is adopted, he provides written notice of his opposition to the restriction and of his intention to demand payment for his shares. M.G.L. ch. 156B, § 86. He must also vote against the amendment. *Id.* Defendant neither filed a written opposition to the S election nor voted against it. In fact, he emphatically supported the S election. Defendant, therefore, does not qualify for relief under ch. 156B.

Defendant argues that he is entitled to relief under the statute because he did not know that the Company's S election operated to limit the transferability of his shares. De-

fendant claims that, because he was not on notice of this restriction, he could not have properly objected to it. The court finds to the contrary. The shareholders collectively understood that, after the S election, they would not be able to transfer their shares to other corporations. The court finds that Defendant, having played a leadership role in the S election, shared this understanding. He, nonetheless, failed to properly object to such restriction and is, therefore, ineligible for relief under ch. 156B.

### III.

### *Conclusion*

For the reasons discussed above, Plaintiffs' request for permanent injunctive relief barring Defendant from transferring a portion of his shares in the Company to AWC and World Class is granted and Defendant's counterclaim, in which he asserts his Dissenter's Rights under ch. 156B and seeks the fair value of his shares, is denied.

---

8. Defendant fails to cite a single case in support of the proposition that the enforcement of a shareholder's fiduciary duty triggers ch. 156B § 77.