<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1948

                 OCEAN SPRAY CRANBERRIES, INC.,

                     Plaintiff, Appellant,

                               v.

                         PEPSICO, INC.,

                      Defendant, Appellee.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

           [Hon. Nancy Gertner, U.S. District Judge]

                             Before

                    Boudin, Circuit Judge,
                                
Reavley, Senior Circuit Judge,

and Lipez, Circuit Judge.

    James C. Burling with whom Michelle D. Miller, Cynthia D.
Vreeland, Mark D. Selwyn and Hale and Dorr LLP were on brief for
appellant.
    Ronald S. Rolfe with whom Toni G. Wolfman, Michael A. Albert,
Foley, Hoag & Eliot LLP, David J. Stone, Illana B. Chill, Victor L.
Hou and Cravath, Swaine & Moore were on brief for appellee.

November 12, 1998

                                
                                

 BOUDIN, Circuit Judge.  This is an appeal by Ocean Spray
Cranberries, Inc. ("Ocean Spray") from a district court order
denying Ocean Spray a preliminary injunction against PepsiCo, Inc.
("Pepsi").  The dispute between the two companies centers on their
distribution agreement, whose exclusivity clause has apparently
been breached by Pepsi.  Although the appeal is not without
substance, we sustain the district court's refusal to grant the
injunctive relief sought.
 Ocean Spray is an agricultural cooperative owned by about
950 cranberry and citrus growers.  It is a leading producer of
canned and bottled juices and juice-flavored beverages; its annual  
sales appear to be well over $1 billion.  Most of its revenue and
profits come from so-called "multiserve" juice products (containers
with more than 20 ounces), which are sold through brokers and
wholesalers.
 The issue in this case is Ocean Spray's sale of so-called
"single-serve" juice products (containers of 20 ounces or less).  
Starting in 1992, Pepsi became Ocean Spray's exclusive distributor
for single-serve juice products.  By 1997, Ocean Spray was deriving
about $125 million from the sale of such products through Pepsi's
company-owned bottlers.  It earned another $100 million or so by
sales through independent bottlers licensed by Pepsi to handle
Pepsi's own products, but the contracts between Ocean Spray and
these independent Pepsi bottlers are not at issue in this case.
 Pepsi's company-owned bottlers supply retailers with
Pepsi products in territories not served by the independent
licensed Pepsi bottlers.  When Pepsi became the exclusive
distributor for Ocean Spray, its company-owned bottlers ceased to
handle the juices of companies competing with Ocean Spray (such as
Welch's and Mott's).  Since 1992, Ocean Spray has enjoyed the use
of Pepsi's company-owned bottlers not only to distribute Ocean
Spray's single-serve products, but also for a range of related
services for those products, including promotion, the securing of
national contracts, purchase of shelf space, and installation of
coolers in grocery stores and restaurants.   
 The original 1992 agreement between Pepsi and Ocean Spray
was a long-term agreement but did not work smoothly.  It was
replaced in 1995 by a new, short-term agreement that Pepsi then
sought to terminate.  Shortly before the termination date, the
parties entered into the present agreement in March 1998; the
agreement provided for Pepsi to distribute through its company-
owned bottlers covered single-serve Ocean Spray juice products.  
The precise definition of a covered single-serve product is not in
dispute.
 The 1998 agreement included Pepsi's promise not only to
distribute the covered products but also to employ "reasonable best
efforts" to promote and sell the Ocean Spray products it
distributes.  It included exclusivity provisions shortly to be
described.  And since 1991, when the parties first entered into
negotiations, both have been bound by a separate contract to
protect each other's confidential information, from marketing and
distribution strategy to research and product formulae.
 The 1998 agreement is exclusive in both directions.  With
limited exceptions, Pepsi agreed that it would not distribute any
noncarbonated juice or juice-containing beverage that competed with
covered Ocean Spray products.  One limited exception permitted
Pepsi to distribute certain juice products that compete with Ocean
Spray covered products if made by Pepsi itself and not acquired
from a third party by a stock or asset purchase or otherwise.  
Conversely, Ocean Spray agreed that it would not distribute--other
than through Pepsi--its own covered products in the territories of
Pepsi bottlers.  
 The 1998 agreement provided for termination by either
party, but the earliest notice Pepsi could give is in 1999, and
even then the agreement was to continue until December 31, 2000.  
Nevertheless, in July 1998, four months after executing the new
distribution agreement with Ocean Spray, Pepsi announced that it
was purchasing Tropicana Products, Inc. ("Tropicana"), a leading
producer of juices and a major competitor of Ocean Spray,
especially in the supply of single-serve containers of orange
juice.
 On August 10, 1998, Ocean Spray filed a complaint and
motion for preliminary injunction in the district court.  Ocean
Spray charged that Pepsi was breaching the 1998 distribution
agreement, which barred it from distributing "directly or
indirectly"  products that competed with Ocean Spray's covered
single-serve products.  Specifically, Ocean Spray sought to enjoin
Tropicana "upon acquisition by Pepsi" from selling competing
single-serve juice products for the duration of the Pepsi-Ocean
Spray 1998 agreement.  Pepsi's acquisition of Tropicana was
completed on August 25, 1998.   
 Pepsi opposed Ocean Spray's motion in the district court,
and both sides filed extensive affidavits.  On August 20, 1998, the
district court entered an order denying Ocean Spray's motion for a
preliminary injunction, and on September 4, 1998, the district
court entered a memorandum and order reaffirming the denial and
setting forth reasons.  The primary basis for denying the
preliminary injunction was a finding of lack of irreparable injury
to Ocean Spray.   
 On this appeal, Ocean Spray argues that Pepsi has
breached its exclusivity obligation under the 1998 agreement, that
Pepsi will inevitably (if it has not already) violate the best
efforts and confidentiality agreements, and that damages would be
difficult, if not impossible, to calculate fully.  Pepsi insists
that its company-owned bottlers continue faithfully to distribute
and market Ocean Spray products and will not handle competing
Tropicana products during the remainder of the 1998 agreement's
term.  Pepsi also denies that it has breached or will breach the
confidentiality agreement.    
 Under federal law, a preliminary injunction depends upon
the familiar four-part test requiring the moving party to show
likelihood of success on the merits, irreparable injury, and a
favorable balance of the equities, including effects on the public
interest.  See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., F.3d
12, 15 (1st Cir. 1996).  Massachusetts standards for a preliminary
injunction do not seem markedly different, see Packaging Indus.
Group, Inc. v. Cheney, 405 N.E.2d 106, 112 (Mass. 1980), and in any
event, neither side here argues that there is a pertinent state-law
difference that would govern a federal court in a diversity matter.  
Cf. A.W. Chesterton Co., Inc. v. Chesterton, 907 F. Supp. 19, 25
n.9 (D. Mass. 1995).  The standard of review in this court is
deferential.
    In this case, Pepsi scarcely disputes that the
acquisition of Tropicana violated its exclusivity obligation under
the agreement as long as Tropicana continues to distribute covered
products.  Ocean Spray seizes on this (occasionally hedged)
concession to argue that the only remaining issue is irreparable
injury; it assumes that the equities are favorable to it (Pepsi's
breach being deliberate), and that the public interest is served by
forcing businesses to adhere to their contracts.  The situation is
slightly more complicated than Ocean Spray suggests.   
    The likelihood of success that is relevant here where an
injunction is sought is the likelihood that Ocean Spray would,
after  trial, be entitled to a permanent injunction to restrain
Tropicana  from distributing competing products during the duration
of the 1998 agreement.  One might suppose that such relief would
follow from Pepsi's concession that Pepsi's ownership of Tropicana
is itself a breach of the exclusivity clause.  Instead, as first-
year law students quickly learn, the enforcement of contracts by
injunction is the exception rather than the rule.
    Historically, equity would not supply relief where legal
remedies sufficed, and damages at law usually do provide remedies
for breach of contract. See Farnsworth, Contracts  12.4, at 852
(2d ed. 1990).  A famous formulation is Justice Holmes's statement
that "[t]he duty to keep a contract in law means a prediction that
you must pay damages if you do not keep it,--and nothing else."  
Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 462 (1897).  
Modern theorists have explained why it is often "efficient" to
limit the remedy to damages and exclude injunctive relief.  E.g.,
Patton v. Mid-Continent Sys., Inc., 841 F.2d 742, 750 (7th Cir.
1988) (Posner, J.).
    Still, injunctive relief requiring performance of a
contract may ordinarily be granted (if other prerequisites are met)
where monetary damages will not afford complete relief.  A common
example is agreements involving the sale of real property; specific
performance is often granted because property is considered unique.  
See, e.g., Walgreen Co. v. Sara Creek Property  Co., 966 F.2d 273,
278 (7th Cir. 1992).  The same principle applies where harm caused
by a breach, although economic in nature, is impossible to measure
accurately.  See Ross-Simons, 102 F.3d at 19.
    Accurate measurement, of course, is a matter of degree.  
Courts have sometimes refused injunctions to enforce franchise or
similar contracts involving ongoing business relationships--
situations in which it would ordinarily be difficult to prove with
perfect accuracy the revenues lost as a result of the breach.   
See, e.g., Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d
70, 72 (2d Cir. 1979); Foreign Motors, Inc. v. Audi of America,
Inc., 755 F. Supp. 30, 33 (D. Mass. 1991).  Thus, some measure of
uncertainty does not automatically avoid Holmes's precept.
    Yet in other cases, uncertainty has been deemed to
warrant injunctions.  For example, in K-Mart Corp. v. Oriental
Plaza, Inc., 875 F.2d 907 (1st Cir. 1989), this court upheld a
preliminary injunction for K-Mart where a shopping mall-landlord
threatened to construct new retail space in a parking lot in front
of the K-Mart, apparently contrary to the terms of the parties' 20-
year lease agreement.  We agreed that "the loss of revenues
resulting from considerations such as diminished visibility,
restricted access, less commodious parking, and the like are
sufficiently problematic as to defy precise dollar quantification."  
Id. at 915.
    In this case, Pepsi's acquisition of Tropicana alters its
incentives to promote Ocean Spray if--and this is a large "if"--one
disregards possible sanctions against Pepsi.  Without Tropicana,
Pepsi's incentives in pricing and promotion of Ocean Spray's
covered products are largely aligned with those of Ocean Spray,
assuming that the distribution contract was competently drafted.  
As one of Ocean Spray's experts points out in his affidavit,
Tropicana's acquisition inserts a conflicting incentive, namely,
that successful promotion of Ocean Spray can take sales away from
Tropicana, in which Pepsi now has an economic interest.
    Of course, the change in incentive is limited.  The
customer sales representatives who work for Pepsi's company-owned
bottlers apparently receive compensation based on a percentage of
sales.  Pepsi also has an incentive to keep content the retailers
to whom it supplies Pepsi, as well as Ocean Spray, products.  
Still, especially at higher levels of the Pepsi company, strategy
as to distribution, Pepsi's pricing of Ocean Spray products, its
promotion expenditures, and other decisions could be affected by
the prospect that Pepsi's long-term interests are now aligned with
Tropicana.
    Ocean Spray's affidavit also makes a plausible case that,
to the extent that Pepsi does slacken its efforts to promote Ocean
Spray's covered products during the remaining (probably brief) life
of the 1998 agreement, the impact could go beyond the loss of sales
and profits.  One affiant points to so-called "spillover" effects
by which diminished promotion of Ocean Spray's widely available
single-serve products could in turn diminish sales of its larger
container products; and consequences may endure beyond the
termination of the agreement, whether viewed as longer-term loss of
sales or impairment of  the value of Ocean Spray's trademark.  
Damages may be difficult to prove with complete accuracy.
    Nevertheless, there is another side to the story.  Pepsi
and Ocean Spray have a relationship stretching back to 1992;
although the contracts differed during this period, this history
provides some benchmark for making judgments as to Pepsi's future
efforts.  Prior sales levels and other prior conduct of Pepsi vis
vis Ocean Spray's products, may make it much easier for Ocean
Spray to detect Pepsi's failure to use its best efforts hereafter
to promote Ocean Spray's products.  Certainly difficulties in
detecting immediate lost sales and profits appear to be
considerably less than in calculating the amount of spillover or
long-term effects.
    If we assume that any slackening of effort can be
detected, Pepsi has counter-incentives to continue behaving as it
would if Tropicana had never been acquired.  While contract
violations do not normally give rise to punitive damages, a
deliberate breach of Pepsi's best efforts obligations could give
rise to multiple damages under Massachusetts's chapter 93A, a claim
that Ocean Spray has already asserted in its complaint.  And there
is nothing that would prevent Ocean Spray from renewing its request
for injunctive relief if it could detect and establish that Pepsi
was not using its best efforts on behalf of Ocean Spray.
    In this important respect, Ocean Spray's situation is
very different from that of the plaintiffs in K-Mart and Ross
Simons.  There, the defendants' proposed actions would have had
immediate adverse effect on the plaintiffs (construction of an
obstructing building in one case and the cut-off of supplies in the
other).  Here, Pepsi's company-owned bottler distribution channel
remains open to Ocean Spray, and the only question is whether Pepsi
will let its pricing and promotion behavior be influenced by the
Tropicana acquisition.  Although businesses act in their economic
best interests, those interests in this case include avoiding
multiple damages and the risk of devastating injunctive relief.
    The second consideration is duration.  Pepsi can give
notice of termination as early as January 1, 1999 (although it
would then continue distributing Ocean Spray until the end of the
year 2000).  Ocean Spray had to know that during that contractually
established transition period Pepsi might consider aligning its
fortunes with another supplier.  In fact, the 1998 agreement
provided for arbitration if there was a claim by Ocean Spray of
lost sales during this transition.
    This is in stark contrast to a case like K-Mart in which
the obligation being breached was a 20-year commitment.  See K-
Mart, 875 F.2d at 915-16.  Not only is the harm potentially much
greater as the period stretches out, but so also the difficulties
of calculating damages.  See id.  We do not say that there is some
basic dividing line between one year and 20, but only that this is
a further consideration that limits the significance of any claim
of irreparable damages.
    Finally, if Pepsi did wrongfully reduce its efforts on
behalf of Ocean Spray and that fact were proved, the jury would
then be entitled to very considerable latitude in estimating the
damages, both from direct and indirect effects.  It is well settled
that the jury is given a good deal of freedom in estimating damages
against a defendant who created the risk of uncertainty as to
damages by its own wrongdoing.  See Jay Edwards, Inc. v. New
England Toyota Distrib., Inc., 708 F.2d 814, 821 (1st Cir. 1983),
cert. denied, 104 S. Ct. 241 (1983); Computer Sys. Eng., Inc. v.
Qantel Corp., 740 F.2d 59, 67 (1st Cir. 1984) (Massachusetts law).  
And, if any up-side error is likely to be doubled or tripled under
chapter 93A, the risks for Pepsi are multiplied.
    One other consideration affecting equities although not
damages is the drastic relief sought by Ocean Spray.  Effectively,
Ocean Spray is asking that after the acquisition, Tropicana be
forbidden from continuing to use its own channels to distribute its
own single-serve juices at all in geographic areas in which Ocean
Spray distributes its competing products.  Tropicana is a leading
competitor, and the effect of so drastic a solution would be
greatly to benefit Ocean Spray by undercutting competition from
Tropicana that existed long before the acquisition was a twinkle in
Pepsi's eye.
    We turn now to a different claim by Ocean Spray:  that
Pepsi has breached and will continue to breach its obligation under
the 1991 agreement to keep confidential Ocean Spray's business
information.  Ocean Spray complains that at the top level of Pepsi
management, the same individuals are responsible not only for Ocean
Spray but for Tropicana.  Ocean Spray points to cases in which the
courts have granted injunctions merely to prevent conduct creating
a risk that confidential information will be divulged or misused.  
See, e.g., Crane Co. v. Briggs Manufacturing Co., 280 F.2d 747, 750
(6th Cir. 1960); Lumex, Inc. v. Highsmith, 919 F. Supp. 624, 636
(E.D.N.Y. 1996).
    Ocean Spray does not spend much time on this issue in its
brief, addressing it in only a few paragraphs.  The case law
suggests that almost everything turns upon the facts, including the
nature of the transaction, the threat of wrongful disclosure, the
consequences if it occurs, and the reach of the relief sought.  
Nothing that we can discern in reviewing the affidavits persuades
us that there is anything inevitable about the misuse by Pepsi of
whatever information Ocean Spray has given or chooses to give in
the future.
    Furthermore, Ocean Spray's claim as to disclosure is
offered only to support the far-reaching injunction it seeks
restraining Tropicana from distributing competing products for the
life of the agreement.  Nothing prevents Ocean Spray from seeking
narrower relief, if this should prove warranted, enjoining the
misuse of confidential information, limiting its distribution
within Pepsi, or otherwise tailoring relief to meet the claimed
threat of harm.  Whether blatant misuse might justify even broader
relief against Tropicana's distribution activity is an issue that
need not now be faced.
    Affirmed.

</body>

</html>