JOHN L. EVANGELISTA *vs.* JAMES K. HOLLAND & another,[1] executors.[2]

No. 88-P-311.

Worcester. January 10, 1989. — April 27, 1989.

Present: GREANEY, C.J., ARMSTRONG, & KASS, JJ.

*Practice, Civil,* Findings by judge. *Corporation,* Close corporation, Valuation of stock, Stockholder. *Sale,* Of stock. *Value. Fiduciary. Contract,* Specific performance.

At the trial of an action arising out of a dispute between the executors under the will of a deceased stockholder in two closely held family corporations and another stockholder with regard to whether a certain stockholders' meeting had accomplished an amendment to a previous stockholders' agreement, which would have raised from $75,000 to $191,000 the amount required to purchase a deceased or withdrawing stockholder's shares, the judge's findings, including his determination that, whatever the deceased may have believed, the objective facts did not support a conclusion that the other stockholders believed their agreement establishing the $75,000 buy-out price had been amended or cancelled, were warranted by the evidence and were not clearly erroneous. [247-248]

Stockholders in two closely held family corporations, who had previously entered into an agreement establishing a buy-out price of $75,000 for the purchase of stock of a withdrawing or deceased stockholder, did not violate the duty of good faith and loyalty owed one another by requiring the executors under the will of a deceased stockholder to relinquish their interest in the corporations for $75,000, although the appraised or market value of the stock was much greater at the stockholder's death. [248-249]

CIVIL ACTION commenced in the Superior Court Department on April 13, 1987.

The case was heard by *William C. O'Neil, Jr.,* J.

---

[1] Bradley M. Schultz.

[2] Under the will of Lawrence L. Evangelista.

*James C. Donnelly, Jr. (Roger W. Lawrence* with him) for the defendants.

*David A. Talman* for the plaintiff.

KASS, J. At first look, the $75,000 which the plaintiff John Evangelista seeks to compel the defendants to accept for their stock in closely held family corporations varies disquietingly from the $191,000 value placed on that stock by the stockholders at a meeting held July 3, 1986. Upon further examination, there is less to the variance then meets the eye. The trial judge, after finding the facts, rightly ordered a sale at the lower price. Those facts, slightly supplemented from the record, are as follows.

In 1956, Anthony, John, Lawrence, and Leo Evangelista, brothers, organized two corporations to run a restaurant called Parkway Diner. Evangelista Bros., Inc., was the operating company and Evangelista Realty Co., Inc., owned the real estate which Parkway Diner occupied, although not exclusively. Stock ownership in both corporations was apportioned among the brothers in four equal parts. All the brothers worked in the restaurant business, as did sisters, children and in-laws. Lawrence, the eldest brother, acted as patriarch of the family and, as such, was president of both corporations. He had the last word on business decisions involving the restaurant although he was not involved in its daily operation.[3] Leo managed Parkway Diner on a day-to-day basis.

From the inception of the business, the brothers had a stockholders' agreement which, in effect, required the corporations to buy out for $35,000 the estate of any stockholder who died. Upon Lawrence's initiative, stimulated by the circumstance that he and Leo were afflicted with cancer, the brothers signed a superseding stockholders' agreement in 1984 which raised the buy-out price to $75,000. The four stockholders fixed on an increase which balanced the appreciation of the stock against the ability of the business to finance stock redemptions without bringing outsiders into the business.

---

[3] Lawrence's daily attention concentrated on managing D'Errico's Market, adjacent to the restaurant, which was owned by his wife's family.

Anthony was the first to die, soon after the 1984 agreement had been executed. In accordance with that agreement, the corporations bought Anthony's shares from his estate for $75,000. Leo's health deteriorated in 1985, and he withdrew from active involvement with Parkway Diner. Relations among the three surviving brothers and their families took a turn for the worse as well, in fair measure because Leo had given his stock in the business to his children, Gael and Jay, with a view to their playing a role in the management of the restaurant. That was a prospect which their uncles viewed with revulsion. Lawrence convened a meeting on July 3, 1986, at the office of the companies' lawyer, Anthony Vigliotti, a nephew, at which control issues were to be thrashed out.

Present at the meeting were John, Lawrence, Jay (with a proxy from his sister Gael), Vigliotti, and James K. Holland, son-in-law to Lawrence and a lawyer. A proposition from a son-in-law of John to buy the entire business for $450,000 came on the table and was rejected as inadequate. There ensued negotiations which the trial judge aptly described in his findings as "taking the form of an auction." Jay offered to buy out John and Lawrence on the basis of a valuation of the entire business at $525,000, in which event John and Lawrence would each receive $175,000 for their stock. John and Lawrence offered to buy out Jay (and his sister) on an assumed value of the business of $575,000. When the dust settled, John and Lawrence had agreed to pay $191,000 for Jay's and Gael's one-third interest in the business. The parties contemplated a closing within ninety days, but John and Lawrence (who was in the end stage of cancer) did not arrange the necessary financing before Lawrence died on October 30, 1986. Several months later, the companies raised the requisite $191,000, but Jay and Gael were no longer interested.

Lawrence's executors regard the July 3, 1986, stockholders' meeting as having worked an amendment to the 1984 agreement and having raised from $75,000 to $191,000 the amount required to purchase the shares of a deceased stockholder. Indeed, the trial judge found that Lawrence "firmly believed that implicit in the discussions as to the value of the stock was an

agreement that the corporation upon his death would redeem his stockholding for $191,000."

Subjective belief does not, alone, convert to fact. The judge found that the meeting of July 3, 1986, had produced negotiations "aimed at terminating a partnership that had soured." In such circumstances, the judge rightly observed, the price of tranquility may be the payment of a premium for the departure of the persons seen as irritants. See *Grobow* v. *Perot*, 526 A.2d 914, 927 (Del. Ch. 1987). No writing had been subscribed to by the parties which purported to amend or cancel the written stockholders' agreement of 1984. Whatever Lawrence may have believed, the judge found that the objective facts did not support a conclusion that the other stockholders (notably John, as Jay then anticipated being bought out) were of a similar mind. The 1984 agreement, therefore, still bound the estate of a stockholder who had died.

1. *The standard by which the judge weighed the evidence.* Lawrence's executors see a mark of error in a sentence in the judge's memorandum of decision which reads: "There was no evidence which could permit me to infer that John Evangelista, the plaintiff in this case, considered that such an amendment [to abrogate or revise the stockholders' agreement] took place, or even was contemplated at the July 3, 1986 meeting." The phrase "[t]here was no evidence," the executors urge, exposes failure by the judge to weigh the credibility of certain witnesses and the force of certain documents which could be seen as tending to prove that the stockholders at the July 3, 1986, meeting had made an amendatory agreement about the purchase of a deceased stockholder's interest. The executors, however, read too much into the judge's language. If he had thought there was *no* evidence to support the executors' position, he need hardly have set forth in detail his findings as to the circumstances of the July 3, 1986, meeting, the informal manner in which the participants conducted their corporate affairs, what was decided at the meeting, and the breakdown of the deal with Jay and Gael. A common sense reading of the judge's conclusory finding is that there was no evidence which he chose to credit that John had agreed to amend the 1984 stockholders'

agreement. To the extent that the judge's writing was transiently less than precise, it was hardly reversible error. See *Sarrouf v. New England Patriots Football Club, Inc.*, 397 Mass. 542, 545 n.5 (1986). We resist the executors' invitation to parse every nuance. See *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 516 (5th Cir. 1969). Comparing the judge's findings with the record, we are satisfied that he considered and weighed all the evidence. See *Ramey Constr. Co. v. Local Union No. 544*, 472 F.2d 1127, 1132 (5th Cir. 1973).

Both lawyers who attended the meeting testified that, in addition to the election of new officers,[4] the purpose of the meeting was to deal with the Jay and Gael interest, not to make a superseding stockholders' agreement. Such minutes as were written reflect those objectives and are conspicuously silent about revision of the 1984 agreement. See *Bendetson v. Coolidge*, 7 Mass. App. Ct. 798, 801 (1979).[5] The record supports the judge's findings and they are not clearly erroneous. See Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974); *First Pa. Mortgage Trust v. Dorchester Sav. Bank*, 395 Mass. 614, 621-622 (1985); *Schwartz v. Schultz*, 25 Mass. App. Ct. 941, 943 (1988).

2. *Equitable considerations.* The executors suggest that to require them to part with their interest in the business for so much less than the price offered Jay and Gael violates the duty of good faith and loyalty owed one another by stockholders in a closely held corporation. See *Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 593-595 (1975); *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 850-851 (1976); *Hallahan v. Haltom Corp.*, 7 Mass. App. Ct. 68, 70 (1979). Questions of good faith and loyalty do not arise when all the stockholders

---

[4] In view of Leo's withdrawal, election was required of an officer designated as responsible for purposes of compliance with regulations relating to the sale of alcoholic beverages.

[5] We do not doubt the familiar proposition, adverted to by the plaintiffs (with reference to such cases as *Samia v. Central Oil Co.*, 339 Mass. 101, 109 [1959]), that stockholders in a closely held corporation may make agreements without any writing at all, but the principle is beside the point because the judge did not find that any superseding agreement, formal or informal, had been made.

in advance enter into an agreement for the purchase of stock of a withdrawing or deceased stockholder. See *Donahue* v. *Rodd Electrotype Co.*, *supra* at 598 n.24. That the price established by a stockholders' agreement may be less than the appraised or market value is unremarkable. Such agreements may have as their purpose: the payment of a price for a decedent's stock which will benefit the corporation or surviving stockholders by not unduly burdening them; the payment of a price tied to life insurance; or fixing a price which assures the beneficiaries of the deceased stockholder of a predetermined price for stock which might have little market value. See *Brigham* v. *M & J Corp.*, 352 Mass. 674, 678 (1967); *Concord Auto Auction, Inc.* v. *Rustin*, 627 F. Supp. 1526, 1531 (D. Mass. 1986). When the agreement was entered into in 1984, the order and time of death of stockholders was an unknown. There was a "mutuality of risk." *Ibid.*

The inherent fairness, without more, of agreements such as that made by the Evangelista brothers in 1984 disposes of the argument of the executors that the agreement ought not now be enforced because it is inequitable. Specific performance will not be refused just because the price now seems inadequate. *New England Trust Co.* v. *Abbott*, 162 Mass. 148, 155 (1894). *Peters* v. *Wallach*, 366 Mass. 622, 628 (1975). *Concord Auto Auction, Inc.* v. *Rustin*, 627 F. Supp. at 1531. The facts found are not such as to lead to a "reasonable conclusion of fraud, mistake, or concealment in the nature of fraud" or "against conscience." *New England Trust Co.* v. *Abbott*, *supra* at 155. Neither John nor the corporation engaged in conduct upon which Lawrence could have reasonably relied. Compare *Pitts* v. *Halifax Country Club, Inc.*, 19 Mass. App. Ct. 525, 533-534 (1985).

*Judgment affirmed.*