Sosman, J.
Plaintiff Robert Olsen has filed the present action complaining that defendants breached the duty of utmost good faith and loyalty owed to plaintiff as a fellow shareholder in a close corporation (Count I) and breached the covenant of good faith and fair dealing in terminating plaintiffs employment with that corporation (Count II). Defendants William Seifert and Agile Networks, Inc. have moved for judgment on the pleadings on the grounds that (1) Delaware law does not impose fiduciary duties on shareholders in a close corporation and (2) Olsen’s claim for wrongful termination fails because the termination of Olsen’s at-will employment did not deprive him of any compensation earned for past services. For the following reasons, defendants’ motion is ALLOWED.
Facts
Plaintiffs Verified Complaint alleges the following:
In the summer of 1991, Olsen, Seifert and a friend of theirs, one Gerald Wesel, decided to form a business to develop and market multi-media communications technology. Olsen characterizes the founders’ initial relationship as that of “partners” and alleges that Seifert promised his “partners” that he would “do well for” and “protect” them.
On November 19, 1991, Olsen, Seifert and Wesel proceeded to incorporate the business as Multimedia Networks, Inc. (“Multimedia”). Multimedia was incorporated as a Delaware corporation and had its principal place of business in Burlington, Massachusetts. Seifert became President and Chief Executive Officer. Olsen was Treasurer and Vice President for Marketing. Wesel was elected Secretary. On November 26, 1991, Olsen, Seifert and Wesel each signed a stock subscription agreement, pursuant to which Olsen and Wesel each invested $10,000 to purchase 30.5% of the common stock and Seifert purchased the remaining 39% of the common stock.
By December 1991, the group had found two sources of venture capital willing to invest a total of $150,000 in Multimedia. On December 24, 1991, Multimedia entered into a formal stock purchase agreement with the two venture capital investors, providing them with preferred stock and two of the three positions on Multimedia’s Board of Directors. Olsen and Wesel resigned their positions on the Board, following which Seifert and the two preferred stockholders comprised the Board.
At the behest of the capital investors, Seifert, Olsen and Wesel also executed stock restriction agreements, setting forth a schedule for the vesting of their stock and giving the corporation the right to repurchase any unvested shares at the original purchase price if that stockholder “ceases to be employed by the Company” prior to December 24, 1996 “for any reason.” On that schedule, 20% of Olsen’s shares would vest after one year, and shares would continue to vest at the rate of 5% every three months, resulting in the vesting of 100% of his shares at the end of five years. The vesting schedule also provided for acceleration (of another 20%) in the event of any merger or consolidation.
During the firstyear of operation, Seifert, Olsen and Wesel each drew annual salaries of $50,000 (which Olsen characterizes as a “subsistence wage” for someone with his background). By June 1992, the working capital was exhausted, and the three worked without pay from May through August of that year. In the fall of 1992, Seifert successfully located a further group of investors who were willing to invest $5.3 million in Multimedia. The new investors were issued preferred stock and bought out one of the original capital investors, at which point they owned the equivalent of about 60% of Multimedia. In addition, the common stock ownership was adjusted such that Seifert had 609,000 shares and Olsen and Wesel each had 375,000 shares of common stock. Following the infusion of this new capital, Seifert’s salary was raised to $108,000 and Olsen and Wesel received salary raises to $105,000.
These new investors also required Olsen, Seifert and Wesel to execute new stock restriction agreements. In November 1992, allegedly in reliance on Seifert’s earlier promise to “protect" his interests and to “do well for” him, Olsen executed the new stock restriction agreement. The November 1992 stock restriction agreement again provided a schedule for the gradual vesting of his 375,000 shares plus a provision that, in the event Olsen “ceases to be employed by the *270 Company prior to the Final Vesting Date for any reason," the corporation had the right to repurchase the remaining unvested shares at Olsen’s original purchase price. The schedule provided that 20% of Olsen’s shares would vest on September 1, 1993 and that shares would continue to vest at the rate of 1.66% each month thereafter, making September 1, 1997 the date on which all of his shares would be vested. This stock restriction agreement (by an amendment executed on November 12, 1992) also provided for an accelerated vesting of an additional 20% of Olsen’s shares in the event of a merger or consolidation.
In January 1993, the name of the corporation was changed to Agile Networks, Inc. (“Agile”). Agile was and is a Delaware corporation with its principal place of business in Massachusetts.
Olsen continued to work for Agile, providing valuable services in the marketing of Agile’s product line. In January 1995, his salary was raised to $110,250.
In the spring of 1996, Lucent Technologies, Inc. (“Lucent”) expressed considerable interest in certain of Agile’s technology and began considering Agile as a potential takeover target. In May of 1996, Olsen had meetings with Lucent’s engineers to review the capabilities and potential of Agile’s products. Meanwhile, Seifert was negotiating with Lucent on a possible merger, but did not keep Olsen advised as to the progress of those talks.
On or about June 3, 1996, Lucent agreed in principle on an acquisition of Agile. On June 6, Seifert terminated Olsen’s employment with Agile without warning and without cause. By June 1996, Olsen’s vested shares of stock under the stock restriction agreement totaled 287,498 shares. As of the date of his termination, there remained 87,502 shares of stock not yet vested under the stock restriction agreement schedule.[1] On June 10, 1996, Seifert caused Agile to exercise its right to repurchase those 87,502 shares at the original purchase price of $1,739.61. Olsen alleges that this exercise of Agile’s repurchase rights was “never approved or ratified” by Agile’s Board of Directors. On July 26, 1996, Agile issued Olsen a check for $1,739.61 for the repurchase of his unvested shares. Olsen refused this tender and returned the check to Agile.
Throughout the summer of 1996, Seifert continued negotiations with Lucent. On October 1, 1996, Lucent and Agile entered into an Agreement and Plan of Merger whereby Lucent agreed to purchase all of the outstanding stock of Agile for $133 million and Agile would be merged with Lucent Technologies Agile Networks, Inc. (a recently formed wholly owned subsidiary of Lucent). Lucent also agreed that Seifert and Wesel would continue to be employed by the subsidiary after the merger. There was no such provision for any (re)employment of Olsen.
By letter dated October 10, 1996, Olsen voted his shares in favor of the merger. In that letter, he also asserted that he held 375,000 shares and claimed that he was entitled to the full merger price ($2,673,000) for all of those shares. The Agreement and Plan of Merger was consummated on or about October 15, 1996. On October 17, 1996, Olsen tendered 375,000 shares for cancellation pursuant to that Agreement. Agile took the position that he was entitled to payment at the full merger price for only 287,498 of those shares, as 87,502 of his shares had been repurchased by Agile under the stock restriction agreement. As a result, Olsen received $2,050,000 for his 287,498 vested shares (plus a tender of $1,740 for the unvested shares repurchased by Agile). Olsen alleges that he is entitled to an additional $623,714 for those unvested shares and that the actions of defendants have wrongfully deprived him of the full merger price for those shares.
Discussion
The effect of a motion for judgment on the pleadings under Mass.R.Civ.P. 12(c) is “to challenge the legal sufficiency of the complaint.” Minaya v. Massachusetts Credit Union Share Insurance Corp. 392 Mass. 904, 905 (1984), quoting Burlington v. District Attorney for the Northern District, 381 Mass. 717, 717-18 (1980). On such a motion, the court must take all well pleaded allegations in the opposing party’s pleading as true and all contravening allegations in the moving party’s pleading as false. Id.; Sampson v. Lynn, 405 Mass. 29, 30 (1989). A factual dispute disclosed by the pleadings does not defeat the motion, as long as the disputed fact is immaterial to the controversy. See Wing Memorial Hospital v. Department of Public Health, 10 Mass.App.Ct. 593, 596 n.3 (1980). Documents attached to the complaint and expressly incorporated therein, along with other documents sufficiently referred to in the complaint or relied upon in framing the complaint, may also be considered without thereby transforming the motion into a Rule 56 motion for summary judgment. See Watterson v. Page, 987 F.2d 1, 3-4 (1st. Cir. 1993); Cortec Industries, Inc. v. Sum Holding, L.P., 949 F.2d 42, 48 (2d Cir. 1991), cert. denied, 503 U.S. 960 (1992).
I. Count 1: Breach of Duty of Good Faith and Loyalty
Olsen contends that Seifert owed him a duty of utmost good faith and loyalty and that Seifert breached that duty when he terminated Olsen on the eve of a very profitable merger and sought to repurchase his remaining unvested shares at the original purchase price. Under Massachusetts law, the majority shareholder(s) in a close corporation owe minority shareholders a duty of utmost good faith and loyalty. See Donahue v. Rodd Electrotype Co., 367 Mass. 578, 593 (1975); Wilkes v. Springwide Nursing Home, Inc., 370 Mass. 842 (1976).[2]
Defendants contend, however, that Massachusetts law does not apply to the intra-corporate relationships of a Delaware corporation and that the law of Delaware *271 has expressly declined to impose any duties to minority shareholders of the type imposed under Donahue and Wilkes. Under Massachusetts law, the law of the state of incorporation governs that corporation’s internal affairs. Beacon Wool Corp. v. Johnson, 331 Mass. 274, 279 (1954); Kessler v. Sinclair, 37 Mass.App.Ct. 573, 575 (1994), review denied, 419 Mass. 1104 (1995); Slattery v. Bower, 924 F.2d 6, 9 (1st Cir. 1991). See also Massaro v. Vernitron Corp., 559 F.Sup. 1068, 1072 (D.Mass. 1983); Hoffman v. Optima Systems, Inc., 683 F.Sup. 865, 872 (D.Mass. 1988).[3]
Plaintiffs complaint alleges that Agile was at all times incorporated in Delaware. Delaware law therefore applies to all claims involving the internal affairs of Agile and the relationships between its officers, directors and shareholders. A claim for breach of duty owed to others in the corporation is clearly a matter concerning the corporation’s internal affairs. See Slattery v. Bower, 924 F.2d 6, 9 (1st Cir. 1991); Hoffman v. Optima Systems, Inc., 683 F.Sup. 865, 872 (D.Mass. 1988); Massaro v. Vernitron Corp., 559 F.Sup. 1068, 1072 (D.Mass. 1983). Thus, the question of what duties Seifert owed to his fellow shareholders, and the question of whether any such duties were breached, must be decided under Delaware law.
Unlike Massachusetts, Delaware law does not impose broad fiduciaiy duties on stockholders of a closely held corporation. See Riblet Products Corp. v. Nagy, 683 A.2d 37 (Del. 1996); Nixon v. Blackwell, 626 A.2d 1366, 1379 (Del. 1993); Ueltzhoffer v. Ueltzhoffer, 1991 WL 271584, 17 Del.J.Corp.L. 1297 (Del.Ch. 1991), aff'd, 618 A.2d 90 (Del. 1992). In Riblet, the Delaware Supreme Court expressly declined to follow Massachusetts’ Wilkes analysis in cases involving the termination of employment of a minority stockholder. 683 A.2d at 39. Previously, in a case concerning lack of equality in the corporation’s arrangements for a buy-back of stock, the court, while recognizing “the dilemma of minority stockholders in receiving fair value for their stock," expressly declined “to fashion a special judicially created rule for minority investors." Nixon, 626 A.2d at 1379, 1380-81. While not citing Massachusetts’ Donahue case, the court in Nixon clearly rejected its substance. Rather than impose such special rules and duties, the Delaware Supreme Court observed that minority shareholders could protect themselves with appropriate stockholder agreements and other contractual arrangements at the time they purchased their stock.[4] Leaving parties free to construct their own contractual protections was viewed as preferable to post hoc imposition of judicially created remedies. 626 A.2d at 1379-80.
Rather than impose a broad duly of utmost good faith and loyally to cover all forms of dealings involving minority shareholders, Delaware law does protect minority shareholders by reviewing those transactions where controlling shareholders benefit from the transaction in a way that goes beyond the benefits accorded to other stockholders. This analysis, referred to as the “entire fairness test,” requires the controlling shareholder(s) to prove the “entire fairness” of such a transaction. See Kahn v. Lynch Communication Systems, Inc., 638 A.2d 1110, 1115 (Del. 1994); Rosenblatt v. Getty Oil Co., 493 A.2d 929, 937 (Del. 1985); Weinberger v. UOP, Inc., 457 A.2d 701, 710-11 (Del. 1983). The “entire fairness” doctrine is designed to deal with those situations where a controlling shareholder has his own interest in the outcome of a transaction that might cloud his otherwise objective business judgment.
As his fall back position, Olsen asks this court to allow Count I to go forward as a claim questioning the “entire fairness” of his termination in relation to the Agile-Lucent merger. Of course, nowhere does Olsen’s complaint challenge the “fairness” of the Agile-Lucent merger transaction itself. Not surprisingly, Olsen voted in favor of the Agile-Lucent deal, as that was the deal that paid him over $2 million on his earlier $10,000 investment. He does not point to any term of the Lucent-Agile merger itself that was unfair to him or that damaged his interests in any way, nor does he contend that Seifert (or any other shareholder) obtained a better price from Lucent. Nothing in Olsen’s complaint even suggests that the terms of the AgileLucent merger need to be reviewed under an “entire fairness” analysis.
What Olsen does complain of is the calculation of the number of shares he held as of the date of the merger. He complains that his termination from Agile prior to the merger prevented him from obtaining additional vested shares up to the merger date and that the stock restriction agreement allowed Agile to repurchase his unvested shares at a price notably below the merger price. It is his termination and its timing, not the merger itself, that Olsen challenges.
However, Olsen points to no Delaware case applying the “entire fairness” doctrine to termination of employment. Notably, the Riblet case involved termination of a chief executive officer who was also a minoriiy stockholder, but the Riblet decision conspicuously falls to mention (let alone apply) the “entire fairness” test. The Riblet court noted that the plaintiffs rights as an employee were based on contract and that he could pursue his contract remedies. 683 A.2d at 40. His contract rights were not enhanced or enlarged because of his status as a shareholder. Here, as in Riblet, the “entire fairness” test does not supplant the terms of Olsen’s employment with Agile (pursuant to which Olsen was an employee at will) nor the terms of Olsen’s stock restriction agreement (which provided for vesting of shares gradually over a period of time and for repurchase of Olsen’s unvested shares at the original price if his employment ceased “for any reason”).[5]
Olsen’s final argument on Count I is that he and Seifert were “partners” and that, notwithstanding any *272 thing in Delaware corporate law or any limitations on the “entire fairness” doctrine, Seifert owed him a duty of utmost good faith and loyalty as a “partner.” The complaint alleges that, at the inception of their planning for the start-up company, Seifert, Olsen and Weselwere “partners.” However, the complaint goes on to allege that Multimedia was incorporated on November 19, 1991. The enterprise was, from that point forward, a corporation. It was, as a matter of law, no longer a partnership.
Public policy does not permit a partnership to do business under the guise of a corporation as to the rest of the world while as between themselves the enterprise conducted in the corporate form is in fact a joint venture or partnership. If they adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners and have only the rights, duties and obligations of stockholders. They cannot be partners inter sese and a corporation as to the rest of the world.
Karanian v. Maulucci, 185 Conn. 320, 323-24, 440 A.2d 959, 960 (1981) (citations omitted). See also Carpenter v. Weichert, 51 App.Div.2d 817, 379 N.Y.S.2d 191, 194, appeal denied, 39 N.Y.2d 708 (1976) (“if a business is conducted as a corporation, it cannot at the same time be carried on as a partnership”). Thus, from November 19, 1991 on, Seifert was no longer Olsen’s “partner.” The duties owed to Olsen were the duties owed to a stockholder, not the duties owed to a partner.[6]
II. Count II: Breach of the Covenant of Good Faith and Fair Dealing
In Count II, Olsen alleges that the termination of his employment and Agile’s subsequent repurchase of his unvested shares violated the implied covenant of good faith and fair dealing. See Fortune v. National Cash Register Co., 373 Mass. 96, 102-05 (1977). In many cases since Fortune, courts have made clear that the implied covenant of good faith and fair dealing does not alter the fundamental concept of employment at-will, which may (notwithstanding the covenant) be terminated for any reason or for no reason at all. If the covenant of good faith and fair dealing required an employer to have a sound and fair reason for terminating an at-will employee, the covenant would destroy the very essence of at-will employment. Rather, Fortune and its progeny hold that, if an at-will employee is terminated in a way or at a time that would deprive the employee of something he has already earned based on his past services, the employer must still compensate him for what he has already earned. See Gram v. Liberty Mutual Insurance Co., 384 Mass. 659, 672 (1981); Ossinger v. Newton, 26 Mass.App.Ct. 831, 837 (1989); Cataldo v. Zuckerman, 20 Mass.App.Ct. 731, 739, review denied, 396 Mass. 1103 (1985); Sargent v. Tenaska, Inc., 108 F.3d 5, 7 (1st Cir. 1997); Coll v. PB Diagnostic, 50 F.3d 1115, 1125 (1st Cir. 1995); Whelan v. Intergraph Corp., 889 F.Sup. 15, 19 (D.Mass. 1995).
Nothing in Count II of the present complaint alleges that form of deprivation. The termination of Olsen did not deprive him of or impair the value of the 287,498 shares of stock that had vested by his termination date, nor did it prevent him from realizing the full benefit of those vested shares upon the subsequent merger.
Olsen had not, as of the date of his termination, earned any vested shares of stock beyond his 287,498 shares. During his tenure at Agile, Olsen was compensated with salary and with a monthly vesting of additional shares of stock. The vesting schedule in the stock restriction agreement provided that shares would continue to vest contemporaneously with each continued month of employment. By definition under that same agreement, the vesting of shares ceased once the employment ceased.[7] The argument that the future vesting of shares was compensation for services that predated Olsen’s termination is thus belied by the express terms of the stock restriction agreement. Agile’s enforcement of the terms of that stock restriction agreement is not a breach of the covenant of good faith and fair dealing.
ORDER
For the foregoing reasons, defendants’ motion for judgment on the pleadings is ALLOWED and it is hereby ORDERED that judgment be entered in favor of defendants.

That calculation provided Olsen with the shares that would have vested for the month of June itself, thus giving him credit for that full month even though his termination occurred during the first week of June.

Given that there were preferred stockholders owning some 60% worth of Agile, Seifert’s ownership of 51% of the outstanding common stock would not make him a majority or controlling shareholder. For purposes of this motion, the court will assume that Seifert nevertheless exerted a degree of influence over the corporation such that, under Massachusetts law, Donahue /Wilkes fiduciary duties should be imposed on him.

Plaintiffs contention that Demoulas v. Demoulas Supermarkets, Inc., 424 Mass. 501, 511 (1997), has changed Massachusetts law in this regard is unpersuasive. In Demoulas, the corporation at issue had originally been incorporated in Delaware and then later merged into a newly formed Massachusetts corporation. Where the conduct complained of spanned both the period during which the corporation had been a Delaware corporation and the period during which it had been a Massachusetts corporation, the court noted that applying two different states’ laws to the activities of what was, in substance, the same corporation would be “a cumbersome and unnecessarily formalistic exercise.” Id. The court therefore proceeded to apply the law of Massachusetts (where the corporation was incorporated as of the time of trial and had been incorporated for more than a decade). The court expressly observed that it was not thereby rejecting the long-standing practice of applying the law of the state of incorporation to intra-corporate disputes. Nothing in Demoulas overruled Beacon Wool, and this court is therefore required to treat Beacon Wool as good law. Moreover, even if the Supreme Judicial Court were to overrule Beacon Wool and *273 adopt a “functional approach” to the choice of law for intracorporate governance (see New England Tel & Tel Co. v. Gourdeou Constr. Co., 419 Mass. 658, 659-60 (1995)), that “functional approach” would also appear to favor applying the law of the state of incorporation. See R. Southgate and D. Glazer, Massachusetts Corporation Law and Practice, §16.5[d] at 542.2-542.5 (1998 Supplement). A state has an obvious interest in the governance of corporations that are incorporated under that state’s laws. More importantly, where shareholders have decided to incorporate in a particular state, applying the law of some other jurisdiction would be contrary to the shareholders’ intent and would frustrate their legitimate expectations. See Hart v. General Motors Corp., 129 App.Div.2d 179, 184-85, 517 N.Y.S.2d 490, 515 N.E.2d 910 (1987); McDermott, Inc. v. Lewis, 531 A.2d 206, 216-17 (Del. 1987).

The court also noted that stockholders could, at the time the corporation was established, choose certain options under specific Delaware statutes governing close corporations. As a practical matter, however, the court observed that most practitioners accomplish the same result by way of contracts rather than take on all the specific limitations and requirements of Delaware’s close corporation statutes. 626 A.2d at 1380.

The Delaware court’s concern that duties owed to shareholders or to shareholder employees should not be implied so as to override express contractual provisions has a corollary in a Donahue/Wilkes analysis under Massachusetts law. In Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404 (1995), the plaintiff complained that his termination violated the duiy owed to him as a minority shareholder where the employment agreement and stock purchase agreement allowed for termination without cause and a repurchase of his stock at book value. While recognizing the duties imposed upon the majority shareholders under Donahue, the court observed that “questions of good faith and loyalty with respect to rights on termination or stock purchase do not arise when all the stockholders in advance enter into agreements concerning termination of employment and for the purchase of stock of a withdrawing or a deceased shareholder.” 420 Mass. at 408. Where the terminating shareholder “received all that he had bargained for,” there was no breach of any duty owed to him, 420 Mass. at 409. See also Evangelista v. Holland, 27 Mass.App.Ct. 244, 248-49 (1989) (forcing estate of deceased shareholder to abide by repurchase terms set in stockholders’ agreement does not violate duty of good faith and loyalty even though actual value of the stock was far higher than the price set in the agreement). Here, the terms on which Olsen’s shares would be repurchased was set forth in the stock restriction agreement, and all Agile has done is enforce the terms of that agreement. That those terms now appear stingy in the wake of Agile’s success does not allow the court to invoke either Massachusetts’ "duty of utmost good faith and loyalty” or Delaware’s “entire fairness” doctrine in order to rewrite the stock restriction agreement.

Nor is Count I salvaged by the references to Seifert promising to “do well for” Olsen and Wesel at the time the business was being planned in August 1991 (Complaint ¶6) or Seifert promising to “protect” them at the time the December 1991 stock restriction agreement was being negotiated (Complaint ¶16). Unspecific promises to “do well for” or “protect” someone else at the time the enterprise is being launched do not expand the duties owed to a fellow shareholder for the life of the corporation, nor do they override express provisions in written stock agreements, nor do they change the terms of Olsen’s employment at Agile. Indeed, where these contracts and transactions ultimately paid Olsen over $2 million on his $10,000 investment in a start-up company, such results would surely fulfill an alleged promise from five years earlier to “do well for” and “protect” Olsen.

Contrary to Olsen’s suggestion, the repurchase provisions were not limited to a voluntary departure. They applied “[I]f Stockholder ceases to be employed by the Company prior to the Final Vesting Date for any reason,” a term that would include cessation of employment on account of involuntary termination.