**In re WET–JET INTERNATIONAL, INC., Debtor.**

**Mark A. Thompson, Charles J. Coté, Larry L. Fisher, and Ross Thompson, Plaintiffs,**

**v.**

**Daniel A. Daluise, Wet–Jet International, Inc., and Matthew D. Rockman, Chapter 7 Trustee, Defendants.**

**Bankruptcy No. 98–46450–HJB. Adversary No. 98–4218.**

United States Bankruptcy Court, D. Massachusetts.

June 4, 1999.

---

James C. Donnelly, Jr., Mirick, O'Connell, DeMallie & Lougee, LLP, Worcester, MA, for Mark A. Thompson, Charles J. Coté, Larry L. Fisher and Ross Thompson.

Daniel Daluise, Southborough, MA, pro se.

### MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for determination is a "Motion to Dismiss or Convert Case to Chapter 11" (the "Motion") and a consolidated Adversary Proceeding filed by the plaintiffs Mark A. Thompson ("Thompson"), Charles J. Coté ("Coté"), Larry L. Fisher ("Fisher"), and Ross Thompson ("R. Thompson") (collectively, the "Plaintiffs" or the "Michigan Shareholders"). Defendants Daniel A. Daluise ("Daluise") and Wet–Jet International, Inc. ("Wet–Jet" or the "Debtor") (collectively, the "Defendants") oppose the relief sought. The issue presented is whether the filing of the instant Chapter 7 case was authorized by a properly elected Board of Directors.

### I. *Facts*[1]

Wet–Jet is a Massachusetts corporation, incorporated in 1995. Its primary asset is a patent for surfacing athletic running tracks. The Wet–Jet process uses recycled rubber and binding agents which its dealers apply in the manner specially prescribed. The corporation has no employees and pays no salaries, but, at the time of the filing of this case, conducted its business exclusively through an affiliate, Tracks Unlimited, Inc. ("Tracks"). Daluise was and is the sole stockholder of Tracks.

Daluise and one James Petrucelli incorporated Wet–Jet to memorialize a royalty

---

1. Facts, except where noted, are undisputed by the parties. Disputed facts are found and conclusions of law are made pursuant to Bankruptcy Rule 7052.

sharing arrangement in consideration of Petrucelli's assistance in perfecting the Wet–Jet process. Petrucelli later sold a portion of his shares to Mark Thompson. A dispute then arose between Petrucelli and American Recycling Center, Inc. ("ARC") and American Distribution Network, Inc. ("ADN"), both owned and controlled by the Michigan Shareholders; and Petrucelli transferred his remaining stock in Wet–Jet to the Michigan Shareholders as part of a settlement of that dispute. The effect of the settlement left Daluise with 57% of the shares of Wet–Jet stock, and the Michigan Shareholders with the remaining 43% of Wet–Jet's stock.[2] In connection with the stock transfer, the parties executed a Shareholders Agreement (the "Shareholders Agreement"), which set at 85% the percentage of shareholder vote necessary to accomplish various acts, including amendments to the articles of organization, the bylaws and a certain Management and Marketing Agreement described in more detail below. The Shareholders Agreement further established that the Board of Directors of Wet–Jet (the "Board") would consist of Daluise and the Michigan Shareholders. At all relevant times, the Michigan Shareholders have also been the stockholders of and controlled ARC, which processes scrap rubber for use by entities such as Wet–Jet, and ADN, which resells binding agents (such as urethane and latex) for use with the recycled rubber in surfacing running tracks, tennis courts and similar facilities. Wet–Jet was a major customer of ARC and ADN at the time of the stock transfer.

The stock transfer and related agreements were executed at a closing held on June 17, 1996 by telephone between the Massachusetts office of Wet–Jet and the Michigan office of the Michigan Shareholders. Both parties had their attorneys present. As part of the closing, the parties also executed the aforesaid Management and Marketing Agreement, which provided, inter alia, that Tracks would "perform for Wet–Jet all its management and marketing functions in a manner consistent with the way it has performed these functions for Wet–Jet in the past." At the request of Mark Thompson, a handwritten insert [3] was added to the bottom of the Management and Marketing Agreement which further provided that "Wet–Jet & its dealers will purchase rubber, latex, urethane, pigments & topcoats from American Recycling Center Inc. & American Distributing Network Inc. exclusively under the terms of the Agreement dated April 29, 1996,[4] or as the agreement is amended or updated from time to time" (the "Exclusivity Provision").

After the closing, the parties understood that Daluise (through Tracks) would retain responsibility for the day-to-day operations of Wet–Jet in its Massachusetts headquarters. Dealers licensed to use the Wet–Jet process were expected to submit their requests for materials to Wet–Jet, and Wet–Jet would forward that request to ARC and ADN, which would in turn drop-ship the required materials to the job site. The dealer would then pay Wet–Jet, and Wet–Jet would then pay ARC and ADN.

During the fall of 1996, relations between the Michigan Shareholders and Daluise became strained. The Michigan

2. Ownership of Wet–Jet's stock after the restructuring was as follows:

| | | |
|---|---|---|
| Daluise: | 568 shares, or | 57.03% |
| M. Thompson: | 257 shares, or | 25.80% |
| R. Thompson: | 57 shares, or | 5.72% |
| C. Coté: | 57 shares, or | 5.72% |
| L. Fisher: | 57 shares, or | 5.72% |

3. This provision was faxed in its handwritten form from the Plaintiff's Michigan offices to Wet–Jet's office where it was adopted without alteration as part of the Management and Marketing Agreement.

4. This agreement (the "Supply Agreement") set forth certain terms according to which Wet–Jet and ARC/ADN would operate, including prices for rubber, latex, urethane and other materials. It actually preceded consummation of the stock transfer but is incorporated by reference in the Management and Marketing Agreement.

Shareholders became concerned about Wet–Jet's delay in paying outstanding ARC and ADN invoices and Wet–Jet's delay in providing certain financial data to the Michigan Shareholders. The delay in payment of the ARC and ADN invoices in turn resulted in cash flow problems for ARC and ADN.[5]

On April 16, 1997, the parties held a meeting in Chicago with the dealers, to hear about the dealers' successes and concerns, and to plan for the upcoming season. The meeting was attended by Daluise, Thompson, Fisher and Coté. At some point during that meeting, Daluise advised the dealers that they could obtain materials from any supplier, and not just from ARC or ADN. The Michigan Shareholders were surprised by this statement but did not discuss it or challenge it during the meeting, presumably to avoid airing their differences in front of the dealer network. No quality issues regarding the materials supplied by ARC and ADN were raised by dealers or discussed at the meeting.

Following the April 16, 1997 meeting, the Michigan Shareholders sent Daluise a letter, dated May 1, 1997, outlining their concerns. In the letter, they requested certain Wet–Jet financial information. They also asserted that the handwritten Exclusivity Provision of the Managing and Marketing Agreement required all dealers to purchase supplies exclusively from ARC and ADN. Daluise responded by letter dated May 8, 1997, alleging that defective materials supplied by ARC and ADN were causing complaints from dealers and their customers.[6] Subsequent telephone conversations and letters between the parties revealed a significant difference in the parties' respective interpretation of the Exclusivity Provision, as well as other problems. While the Michigan Shareholders believed

that the Exclusivity Provision required all dealers to purchase materials only from ARC and ADN, Daluise viewed that provision as simply dictating the exclusive terms, should a dealer elect to purchase from ARC and ADN. Through their various letters and conversations, the Michigan Shareholders further complained that Wet–Jet was failing to properly remit payments it received from dealers to ARC and ADN, and was failing to supply financial information about its activities with dealers. In turn, Daluise alleged that ARC and ADN were supplying defective materials, not providing sufficient materials (due to credit limitations placed on ARC and ADN by their suppliers), overcharging for latex, and had misrepresented the financial fitness of a dealer which later dissolved (leaving behind substantial unpaid invoices due to both ARC/ADN and Wet–Jet). He claimed that the Michigan Shareholders had breached their fiduciary duties to Wet–Jet by a pattern of self-dealing designed to further the interests of ARC/ADN at the expense of Wet–Jet. Each party alleged outstanding debts owed by the other.

In an effort to resolve their differences, a Wet–Jet Board of Directors meeting was held on June 26 and 27 of 1997, in Massachusetts, and was attended by all of the directors. After substantial discussion, held over the course of the two day Board meeting, the Board took several votes. The Board unanimously voted to require Wet–Jet and Tracks to investigate and resolve complaints and warranty claims of customers and dealers by establishing a procedure for working with ARC and ADN on suspected material problems and by developing a standardized procedure for handling claims. The Board also unanimously voted to elect Daluise as Presi-

5. No precise testimony was given regarding the actual amounts outstanding at that time, but Coté testified that outstanding invoices may have been in the millions of dollars.

6. Neither party submitted this letter into evidence. However, the letter was referenced in the Joint Pretrial Statement. Further, Defendants' Exhibits do reflect a history of problems with materials supplied to dealers by ARC and ADN.

dent, Fisher as Secretary and Coté as Treasurer. However, over Daluise's objection, the Board also voted to require the signatures of two directors on each Wet–Jet check, to interpret the Management and Marketing Agreement's Exclusivity Provision as requiring all Wet–Jet dealers to purchase materials from ARC and ADN, and to require Daluise to enforce that interpretation of the Exclusivity Provision. Having completed their business in Massachusetts, the Michigan Shareholders returned to Michigan.

However, Daluise was not satisfied and set in motion the chain of events which follow. On June 30, 1997, Daluise issued a notice of Wet–Jet Special Stockholders meeting to be held on July 10, 1997. The notice provided that the specific issues to be determined at the meeting were whether the Board had exceeded its authority, whether the Michigan Stockholders should be disqualified from voting as directors regarding actions involving ARC or ADN, and what actions, if any, should be taken regarding the conduct of the Michigan Stockholders.

On July 7, 1997, three days prior to the scheduled Wet–Jet Special Stockholders' meeting, the Michigan Shareholders returned fire. They gave notice that a Wet–Jet Special Board of Directors meeting would be held in Michigan on July 8, 1997, and included a telephone number for Daluise to call so that he could participate in the meeting telephonically if he so chose.[7] At that Special Board of Director's meeting held on July 8, 1997, but without Daluise's participation, the Board voted to change the address of the corporate offices to the Michigan headquarters of ARC and ADN, to conduct all pricing, negotiations and agreements with dealers exclusively through the Michigan headquarters, and to require Tracks to file monthly reports on accounts receivables, revenue and sales

with the Michigan headquarters. The Board also elected Thompson as Wet–Jet's new president. Later that day, Thompson sent a memorandum to all Wet–Jet dealers outlining these changes, and insisting that all payments thereafter be sent to the new Michigan address of Wet–Jet.

On the morning of July 10, 1997, the Michigan Shareholders' attorney sent a letter protesting the actions proposed to be taken at the Special Stockholder meeting called by Daluise. Undeterred, Daluise conducted that meeting as advertised, and voted his shares in favor of resolutions finding that the Michigan Shareholders had exceeded their authority when voting at the June 26, 1997 Board meeting, had endangered Wet–Jet, and had a conflict of interest with Wet–Jet. Daluise then voted to disqualify the Michigan Shareholders from voting and to remove them from the Board. A new Board was elected consisting of Daluise, Cynthia A. Meisenheimer, who had formerly acted as Wet–Jet's Clerk, and one John Chaffin. Daluise subsequently failed to respond to the Michigan Shareholders' demand that they be reinstated.[8]

On July 15, 1997, Daluise and Tracks filed suit against the Michigan Shareholders in Commonwealth of Massachusetts Superior Court Department of the Trial Court, alleging breach of fiduciary duty, and joining Wet–Jet under Rule 19 as an indispensable party. This action was then removed by the Michigan Shareholders to the United States District Court for the District of Massachusetts, under its diversity jurisdiction. The Michigan Shareholders (appearing as defendants) next filed a motion for a preliminary injunction seeking that the court restore them to the Board. That motion was denied on February 13, 1998 (Gorton, J.). An appeal to the First Circuit Court of Appeals followed.

7. Telephonic participation in Special Directors' meetings is specifically authorized in the Bylaws.

8. Michigan Shareholders made their demand pursuant to Section 8 of the Agreement, which provides that the non-defaulting party may bring legal action to enforce the Agreement in equity.

The time for Daluise, Tracks and Wet–Jet, now appellees before the First Circuit, to file responsive briefs was extended three times to facilitate the ultimately unsuccessful settlement negotiations. On August 28, 1998, two days before the answer was due, the Board of Directors of Wet–Jet[9] voted to authorize the filing of a voluntary petition under Chapter 7 of the Bankruptcy Code. The Michigan Shareholders filed their Motion and Adversary Proceeding seeking dismissal or conversion of the case shortly thereafter, challenging the sufficiency of the vote of the replacement Wet–Jet Board of Directors on the grounds that the new Board was improperly constituted by Daluise, in violation of the Shareholders Agreement.

## II. *Analysis*

■ By virtue of their Motion to Dismiss and Adversary Proceeding, the Michigan Shareholders allege that the Wet–Jet Board which voted in favor of a resolution to file a petition for relief under the Chapter 7 of the Bankruptcy Code was improperly constituted, and thus incompetent to pass the said resolution. The source of a corporation's authority to file a bankruptcy petition is found in state law, not in the Bankruptcy Code. *See Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 516, 89 L.Ed. 776 (1945). Massachusetts corporate law grants to the board of directors of a corporation "all the powers of the corporation, except such as by law, by the articles of organization or by the by-laws of the corporation are conferred upon or reserved to the stockholders." Mass.Gen. Laws ch. 156B, § 54 (1964). Unless specifically stated otherwise in the by-laws or articles of organization, only the board of directors has the authority to file a bankruptcy petition.[10] *See Wynco Distributors,*

*Inc. v. Wynn (In re Wynco Distributors, Inc.),* 126 B.R. 131, 133 (Bankr.D.Mass. 1991); *In re Milestone Educational Institute, Inc.,* 167 B.R. 716, 720 (Bankr. D.Mass.1994); *In re E.T. Russell Co.,* 291 F. 809, 817–18 (D.Mass.1923). Therefore, the validity of the filing of this Chapter 7 case is fully dependent on whether the vote authorizing that filing on August 28, 1997 was made by the duly elected, properly constituted Board of Directors of Wet–Jet. If not, the Motion to Dismiss must be allowed. And critical to this determination is the impact of the Shareholders Agreement on the respective duties which the Michigan Shareholders and Daluise owed one another and how those duties impacted on their respective rights to serve as directors at the time of the vote in question.

### A. *Fiduciary Duty owed by Shareholders of a Close Corporation*

■ In general, a closely held corporation is one in which the stock is held by a small number of shareholders and in which the shareholders participate directly in the management and operation of the corporation. *See Donahue v. Rodd Electrotype Co.,* 367 Mass. 578, 583, 328 N.E.2d 505, 511 (1975). Wet–Jet clearly fits this definition, and the parties do not dispute this.

In the overwhelming majority of situations, no ready market exists for the stock of a closely held corporation. *See id.* As a result, minority shareholders often find themselves in a double bind—they are dependent on the corporation for their livelihood and the protection of their capital investment; and yet they have no effective means to combat the oppression of their interests by the majority, and no means to recover their capital investment on the open market.

---

**9.** Board membership remained as it had been fixed by the majority stockholder, Daluise, at the July 10, 1997, Special Stockholder meeting—it did not include the Michigan Shareholders.

**10.** The corporate documents of Wet–Jet which are before the Court do not appear to prohibit the Board of Directors from voting to file a petition under the Bankruptcy Code. However, the documents provided to the Court were incomplete, the by-laws ending mid-sentence on page 10, section 8.

Massachusetts law has, therefore, recognized that, in the foregoing characteristics, the closely held corporation resembles a partnership, and has imposed on shareholders the same standard of "utmost good faith and loyalty" as partners owe one another. *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 848, 353 N.E.2d 657, 661 (1976); *see also Donahue*, 328 N.E.2d at 511 (1975) ("the relationship among stockholders must be one of trust, confidence and absolute loyalty"). "Stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self interest in derogation of their duty of loyalty to the other stockholders and to the corporation." *Donahue*, 328 N.E.2d at 515, *quoted in, Wilkes*, 353 N.E.2d at 662. *See also Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 528, 677 N.E.2d 159, 179 (1997) (shareholders of a close corporation owe each other a duty which is even stricter than that required of directors and shareholders generally).

Notwithstanding its elucidation of the duties of shareholders in close corporations to one another, the Massachusetts Supreme Judicial Court was careful to warn in *Wilkes* that such duties ought not to be seen as an inflexible impediment to sound decision making. "[W]e are concerned that untempered application of the strict good faith standard enunciated in Donahue ... will result in the imposition of limitations on legitimate action by the controlling group ... which will unduly hamper its effectiveness in managing the corporation in the best interests of all concerned." *Wilkes*, 353 N.E.2d at 663. "Even in close corporations, the majority interest 'must have a large measure of discretion, for example, in declaring or withholding dividends, deciding whether to merge or consolidate, establishing the salaries of corporate officers, dismissing directors with or without cause, and hiring and firing corporate employees.'" *Merola*

*v. Exergen Corp.*, 423 Mass. 461, 464, 668 N.E.2d 351, 354 (1996), *quoting, Wilkes*, 353 N.E.2d at 663.

Partly in response to the developing case law in Massachusetts, individuals embarking on a common enterprise through a close corporation have sought some alternative means to control their individual liability for actions taken as directors and majority shareholders on behalf of the corporation, and to more specifically define their substantive obligations. *See* Thomas P. Billings, *Remedies for the Aggrieved Shareholder in a Close Corporation*, 81 Mass.L.Rev. 3, 20 (1996) (herinafter, "Billings"). Often, these efforts have taken the form of shareholder agreements governing such issues as the makeup of the board of directors, employment contracts for shareholders, stock repurchase arrangements, payment of dividends, voting rights and others. *See* Steven N. Bulloch, *Shareholder Agreements in Closely Held Corporations: Is Sterilization an Issue?*, 59 Temp. L.Q. 61 (1986).

Shareholder agreements are enforced under traditional principals of contract law, including the general requirement of good faith and fair dealing, a standard lower than that owed between shareholders of a close corporation. *See Concord Auto Auction, Inc. v. Rustin*, 627 F.Supp. 1526 (D.Mass.1986) (enforcing a stock repurchase and transfer restriction agreement); *Blank v. Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 406, 649 N.E.2d 1102, 1105 (1995); *Evangelista v. Holland*, 27 Mass.App.Ct. 244, 537 N.E.2d 589 (1989) (upholding deceased stockholder buyout agreement); Mass.Gen.Laws ch. 156B, § 41A (1986) (shareholder agreements may dictate how shares are voted); Billings at 20. Massachusetts courts have recognized that the existence of a stockholder agreement impacts the heightened duty standard laid out in *Donahue*. *See Blank*, 649 N.E.2d at 1105–06. As a consequence, corporate law in the Commonwealth reflects a distinction between disputes arising from actions relating to the

subject matter of a shareholder agreement, and those stemming from shareholder dealings in matters outside of the agreement. *Id.* at 1106 ("The fact that a stockholder has entered into an employment agreement or the fact that stockholders execute a valid stock purchase agreement does not relieve stockholders of the high fiduciary duty owed to one another in all their mutual dealings.")

■ The fact pattern of *Blank* provides a good illustration. Dr. Blank was a physician whose interest in and employment for a small professional corporation was terminated. That termination was effectuated in accordance with an employment contract and stock repurchase agreement which provided for such termination without cause on six month's notice and repurchase of the terminated employee's shares at book value. When Dr. Blank sued for breach of contract, breach of fiduciary duty and other alleged injuries,[11] the Supreme Judicial Court held the termination proper because the terminating shareholders had acted in accordance with their agreement. *See id.* at 1105–06. In other words, the actions taken by the defendants—termination and stock repurchase—fell squarely within the ambit of the agreements governing these matters, made at the outset of the relationship between the plaintiff and the defendants. The court held that these actions were governed by the general covenant of good faith and fair dealing applicable to contractual agreements, rather than the much higher standard of utmost good faith and loyalty owed between stockholders in a close corporation. Where there is no indication of any failure in the duty of good faith and fair dealing at the time that stockholder agreements are executed, issues of the breach of fiduciary duty do not arise when one party simply seeks to exercise its rights under those agreements.

*See King v. Driscoll,* 418 Mass. 576, 586, 638 N.E.2d 488, 494 (1994), *citing Evangelista v. Holland,* 27 Mass.App.Ct. at 248–49, 537 N.E.2d 589.

■ In contrast, the Supreme Judicial Court has recognized that where the controversy between the shareholders arises not from the subject matter of a stockholder agreement related to stock repurchase or employment termination, but from the conduct of the majority shareholders leading up to such repurchase or termination, that conduct will be evaluated in light of the high fiduciary duty owed to fellow shareholders in a close corporation. *See King,* 638 N.E.2d at 494. In *King,* the plaintiff, a vice president and shareholder in a close corporation, participated in a derivative suit arising from an internal power struggle between two other shareholders. The winner of the struggle ultimately fired King, who then sued under the theory that his termination was against public policy and represented a breach of the duty of utmost good faith and loyalty owed amongst the shareholders of a close corporation. *Id.* at 490–91. The majority sought to take shelter in the shareholder agreements, but the Supreme Judicial Court found for King, ruling that the complained of conduct of the majority shareholders did not arise solely under the provisions of the stock repurchase and employment agreements, but instead preceded the exercise of those rights.

■ Each of the foregoing cases on the duties of shareholders to one another in close corporations relates specifically to employment and/or stock repurchase contracts. The shareholder agreement at issue in the instant case does not involve employment or stock repurchase. In material part, it is an agreement setting a minimum vote for any amendment to other

---

**11.** Dr. Blank's suit included claims for breach of contract, breach of fiduciary duty, conspiracy, intentional infliction of emotional distress, and unfair and deceptive trade practices. The lower court granted the defendants' motion to dismiss for failure to state a claim on which relief could be granted, and the Supreme Judicial Court affirmed on direct appeal.

agreements and fixing the membership of the Board of Directors. However, as in the case of disputes arising under stock repurchase and employment agreements, many of the concerns underlying the adoption of the *Donahue* standard diminish considerably when the minority and majority shareholders execute an agreement setting out their respective roles, rights and responsibilities at the outset of their relationship. A distinction ought therefore to be drawn between actions taken by stockholders with respect to one another, which are explicitly covered by their unfettered agreement to be bound, and actions taken outside of such an agreement. Such a distinction "does not relieve stockholders of the high fiduciary duty owed to one another in all their mutual dealings." *Blank,* 649 N.E.2d at 1106. It merely gives effect to the intention of the parties with regard to the specific terms of their agreement, and yet leaves the policies underlying the *Donahue* decision intact by retaining a high level of scrutiny over dealings that fall outside the terms of the shareholder agreement.

## B. *Breach of the Shareholder Agreement*

 The parties entered into the Shareholders Agreement at the outset of their current relationship, voluntarily, without duress and on the advice of counsel. Pursuant to their agreement, membership on the Board of Directors was to be fixed, and various agreements (including the Management and Marketing Agreement), the by laws and the articles of organization could not be amended by vote of less than 85% of all shares. Nothing in Massachusetts law would render such an agreement unenforceable *per se.* In keeping with the above-stated principles, the inquiry then is whether the acts taken by Daluise and the Michigan Shareholders were consistent with that Shareholder Agreement and whether they acted in furtherance of that agreement in a manner consistent with their duties to one another.

Relevant portions of the parties' strained relationship begin with the alleged defects in materials sold to the Wet–Jet customers, and the alleged failure of Wet–Jet to timely pay invoices to ARC or ADN or provide financial information to the Michigan Shareholders. Each of the parties contest the allegations of the other; but, even if true, none resulted in an attempt to permanently alter their relationship in a manner which violated either the Shareholders Agreement or their duties of good faith toward one another. Each disagreement comprised a business dispute, albeit between shareholders, and each was resolved by the June 26, 1997 meeting, pursuant to which a procedure was employed to investigate warranty claims, Daluise agreed to provide the information sought by the Michigan Shareholders, and the Michigan Shareholders—by virtue of the additional check signing authority and the appointment of Coté as Treasurer—were assured of additional financial oversight. The same is true with respect to the statement made by Daluise to the dealers, suggesting that dealers could purchase materials from sources other than ARC or ADN. The parties' difference in their respective interpretations of the Exclusivity Provision was an honest one, and was resolved by the Board of Directors. Nor did that vote constitute an amendment to the Management and Marketing Agreement (prohibited in the absence of an affirmative 85% vote), inasmuch as this Court finds, after hearing the evidence, that the interpretation ultimately adopted was consistent with the intention of the parties on their entering into the Management and Marketing Agreement.

Further, Daluise's June 30, 1997 Notice of Special Stockholders' meeting, scheduled to take place on July 10, 1999, did not, by itself, violate the Shareholders Agreement. Albeit suggesting *proposed* actions which would have violated the Shareholders Agreement, the calling of the meeting was, standing alone, in violation of no duty or agreement. The Notice met all the requirements of the by-laws. Likewise,

the July 7, 1997 notice of a Special Board of Directors' meeting, scheduled to take place just one day prior to the Stockholders' meeting was, by itself, in violation of no duty or agreement. It was given in compliance with the by-laws.

Less benign were the actions taken at those respective meetings, and, unfortunately for the Michigan Shareholders, they acted first. At the Special Directors' meeting, conducted without Daluise's attendance or participation,[12] the Michigan Shareholders voted to change the corporation's address to Michigan. This operated to amend the by-laws, which specified a Massachusetts address for the corporation, without the requisite 85% vote required in the Shareholders Agreement. In addition, the Michigan Shareholders voted to conduct all pricing, negotiations, and contractual agreements from the new Michigan offices, to require that all payments were to be made to the new address, and voted in Mark Thompson as president (replacing Daluise)—further solidifying their control over Wet–Jet. That shift of financial control was an attempt to permanently amend the Management and Marketing Agreement, which required that Wet–Jet's business be operated by Tracks.

On July 10, 1997, Daluise, as the sole participant in the Special Shareholders' meeting, voted his shares to remove the Michigan Shareholders from the Board of Directors. That action violated the Shareholders Agreement, which fixed membership on the Board as Daluise and the Michigan Shareholders. Thus, it appears that the Michigan Shareholders breached the Shareholder Agreement on July 9, 1997; just one day prior to the Special Stockholders' meeting at which Daluise breached the Shareholders Agreement.

 Because both the actions taken by the Michigan Shareholders and Daluise were in direct violation of the Shareholder Agreement, the timing of both breaches becomes crucial to the determination of whether Daluise was justified in his actions of July 10, 1997. Massachusetts follows the well-recognized rule that a material breach in performing a contract excuses the other party from further performance as a matter of law. *See Quintin Vespa Co. v. Construction Serv. Co.,* 343 Mass. 547, 554, 179 N.E.2d 895, 899 (1962); *Hastings Assoc., Inc. v. Local 369 Bldg. Fund, Inc.,* 42 Mass.App.Ct. 162, 170, 675 N.E.2d 403, 411 (1997); *Lease–It, Inc. v. Massachusetts Port Auth.,* 33 Mass.App.Ct. 391, 396, 600 N.E.2d 599, 602 (1992). "A material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the contract [ ].'" *Lease–It, Inc.,* 600 N.E.2d at 602, *quoting Bucholz v. Green Bros. Co.,* 272 Mass. 49, 52, 172 N.E. 101 (1930). Whether a breach is material is properly a question for the finder of fact. *See Hastings Assoc.,* 675 N.E.2d at 411.

The Wet–Jet Shareholder Agreement reflects the intention of the parties to balance control of the corporation between the two groups of shareholders, Daluise and the Michigan Shareholders. The balance struck between the two groups is a critical feature of the Shareholders Agreement. It is highly unlikely that either party would have undertaken ownership and management of Wet–Jet absent the protections offered by the Shareholders Agreement. Both parties breached portions of the Shareholders Agreement which go to the heart of the purpose for entering that agreement—the Michigan Shareholders by seizing control over the corporation's income stream and Daluise by taking control of the Board of Directors. Because the breached provisions of the Shareholders Agreement were central to its purpose, and the agreement was central to the overall transaction, both breaches were material.

---

**12.** Daluise was provided a telephone number in the notice of the meeting, and thus had the opportunity to participate.

The Michigan Shareholders breached the Shareholders Agreement on July 8, 1997, by voting to move the corporate headquarters and seizing control of the corporation's operations, two days prior to Daluise's actions taken in response at the Special Shareholders' meeting. Under the circumstances, the actions of the Michigan Shareholders were also a violation of their duties to Daluise as stockholders of a close corporation. And, most important, the precipitous actions of the Michigan Shareholders constituted a material breach which excused Daluise from further performance under the Shareholders Agreement. *See Lease–It, Inc.,* 600 N.E.2d at 602. The fact that Daluise had expressed an *intention* to potentially breach the Shareholders Agreement as well does not change this outcome.[13] Daluise was, therefore, justified in refusing to continue performance of his own obligations under that Agreement. He was free to act as majority shareholder in reconstituting the Board of Directors.

In light of the foregoing, this Court finds that the Board of Directors which authorized the filing of the instant petition was properly formed and constituted. As a result, the Board's vote to file a petition under Chapter 7 of the Bankruptcy Code was itself proper.

■ Finally, the Michigan Shareholders presented little or no evidence which would cause this Court to believe that a Chapter 11 reorganization is viable here. The Debtor Wet–Jet has no assets other than its patents and no business operations other than its circumscribed contractual relationships with Tracks, ARC and ADN (which have imploded). Wet–Jet may

have valuable assets, but has no separate infrastructure. The Michigan Shareholders had the burden to demonstrate the probability of a confirmable plan of reorganization. They failed to meet that burden. Under those circumstances, this Court has no evidence that any Chapter 11 plan would be feasible.[14]

### III. *Conclusion*

For the foregoing reasons, the Motion of the Plaintiffs to Dismiss or Convert this Chapter 7 case is denied. Judgment on the Adversary Proceeding is granted to the Defendants.

---

13. Massachusetts does not recognize the doctrine of anticipatory repudiation. State law requires that the innocent party wait until performance is due before suing for breach. *See Federal Deposit Ins. Corp. v. Source One Mortgage Serv. Corp.,* 844 F.Supp. 40, 43 n. 7 (D.Mass.1994). Further, the doctrine requires a definite and unequivocal statement of the party's intent to repudiate the agreement. *See Dingley v. Oler,* 117 U.S. 490, 6 S.Ct. 850, 29 L.Ed. 984 (1886). Here, Daluise merely

stated an intention to review actions taken and to vote on actions which, if the votes carried, would constitute a breach. Such a statement is not sufficiently definite to satisfy this requirement.

14. Of course, any other party in interest is free to seek conversion of the case to Chapter 11.